Ray **MARKT,** Trustee, on behalf of himself and James Bigelow, et al., Plaintiffs,

v.

**RO–MART, INC.,** and Fred Mantezani, Individually and doing business as 39 Main Street, Defendants.

No. C78–1007 AJZ.

United States District Court, N. D. California.

June 1, 1979.

Leonard & Patsey, John A. Toker, San Francisco, Cal., for plaintiffs.

William B. Peavey, Jr., San Francisco, Cal., for defendants.

## MEMORANDUM OPINION

ZIRPOLI, District Judge.

Plaintiffs, trustees of a health and welfare fund and a pension fund for the Bartenders and Culinary Workers Union Local 126, filed this suit to collect allegedly unpaid contributions from defendant Ro-Mant, Inc., erroneously sued as "Ro-Mart, Inc.," a corporation that operates a tavern known as "39 Main Street" in Tiburon, California. Jurisdiction is based upon section 301 of the Labor Management Relations Act, 29 U.S.C. section 185. The case was tried to the court, post-trial memoranda were filed, and the case was submitted. The court finds for the plaintiff and orders relief as hereinafter designated.

The Bartenders and Culinary Workers Union Local 126 ("Union") entered into a collective bargaining agreement effective July 1, 1974, with the Marin County Restaurant and Tavern Owners Association, Inc. ("Association"). This agreement was admitted into evidence as Plaintiffs' Exhibit 1. Section 23 of that agreement provides for the Health and Welfare trust, and specifically states in section 23(a):

> The plan will be financed by Employer contributions to a Trust Fund. Said contributions shall be paid by each Employer beginning July 1, 1962, at the rate of, and in no case less than, fifty-three cents ($.53) per shift for each shift worked by each and every employee during the current month. . . .

Subsection (d) of section 23 further provides:

> All employees shall be paid for, at the applicable rate according to subparagraph (a) of this Section, immediately upon their employment and shall be eligible and covered in accordance with the Group Insurance Plan.

Section 25 provides for a pension plan trust, as follows:

> Effective July 1, 1962, the Employer shall contribute twenty-five cents ($.25) per shift for each employee, to provide a pension plan. . . .

Defendant Ro-Mant, Inc. was not a party to this agreement when it was originally signed in 1974, as Ro-Mant did not acquire 39 Main Street until 1975. When Ro-Mant took over the tavern, it entered into a Memorandum Agreement with the Union. Section 1 of the Memorandum Agreement recognized the Union as the sole collective bargaining agent of its employees. Section 2(a) was an agreement to apply the terms of the collective bargaining agreement between the Union and the Association as they related to wages, hours, and working conditions, "including . . . the health and welfare and pension plans and contributions thereto, of all the employees employed by the Employer." Section 2(b) states that the employer agrees to be bound by the terms of the trust agreements. The Memorandum Agreement was admitted into evidence as Plaintiffs' Exhibit 2. Plaintiffs' Exhibit 3, also in evidence, is the trust agreement itself.

█ It is undisputed that defendant has made contributions to the trust funds on behalf of each Union member employed. It is also undisputed that defendant has not made contributions on behalf of workers who were not at the time members of the Union, save some made by clerical oversight. The dispute in this case is whether or not contributions are due on behalf of employees who are not also members of the Union. It is clear that such contributions are required.

The defendant offers three arguments in support of the position that payments are required only on behalf of workers who are union members. First, it argues that the contracts can be read to so state. Second, it argues that even if the contracts need not be read this way, there is sufficient ambiguity to permit the introduction of parol evidence that will support defendant's interpretation. Third, defendant argues that even if the contracts require payments on behalf of all workers, the plaintiffs are estopped to make such a claim at this time. Each argument must be rejected.

**1. Construction of the Agreements**

Defendant acknowledges that if section 23(a), requiring contributions on behalf of "each and every employee," were read in isolation from the remainder of the agreement, there would be no question that defendant owed contributions on behalf of non-union as well as union employees. Defendant argues, however, that section 23 must be read in light of other provisions of the agreements, particularly section 3(a) of the collective bargaining agreement between the Association and the Union, incorporated by reference into the Memorandum Agreement signed by defendant. That section provides:

SECTION 3. UNION SHOP AND HIRING:

(a) It shall be a condition of employment that all employees of the Employer covered by this Agreement who are members of the Union in good standing on the effective date of this Agreement shall remain members in good standing, and those who are not members on the effective date of this Agreement shall, on or after the thirtieth (30th) day following the effective date of this Agreement, become and remain members in good standing in the Union. It shall also be a condition of employment that all employees covered by this Agreement and hired on or after its effective date shall, on or after the thirtieth (30th) day following the beginning of such employment, become and remain members in good standing in the Union.

Defendant argues that this provision defines the term "employee" as it is used throughout the balance of the collective bargaining agreement, and that this definition limits the term to include only members of the Union.

A careful reading of this provision reveals that it neither defines terms nor limits the term "employee" to any meaning other than that typically expected—one who performs work for compensation. The language of section 3(a) indicates that the paragraph has substantive content: it describes the requirement that the Employer

not retain in its hire for more than thirty days persons who do not become and remain members of the Union. Such a "Union Shop" clause is a common feature of collective bargaining agreements and is present not to assist in interpreting the subsequent provisions of the agreement, but to define the interrelationship between the union, the employer, and the employees.

Furthermore, even if some delineation of terms can be derived from section 3(a), it cannot be the interpretation that defendant seeks. The union shop clause finds its origin in section 8(a)(3) of the National Labor Relations Act, 29 U.S.C. section 158(a)(3), wherein Congress permitted one exception to the rule that an employer may not encourage or discourage union membership, that being that an employer may enter into a collective bargaining agreement providing that membership may be required after the thirtieth day of employment, and permitting termination for non-payment of dues. This has been interpreted to mean that an employee may not be fired where union dues have been tendered, even though the employee otherwise declines to become affiliated with the union. *National Labor Relations Board v. Hershey Foods Corp.*, 513 F.2d 1083 (9th Cir. 1975). Thus, collective bargaining agreements typically include a union shop clause in order to guarantee payment of union dues; the language of the clause notwithstanding, union membership may not be required.

The union shop clause in section 3(a) therefore does not define "employee" and in any event does not require that anyone become a union member. Rather, the clause requires that union dues be paid by persons who were (1) members of the union at the effective date of the agreement; (2) not members at the effective date of the agreement, but continued to work for the employer for thirty days after the effective date of the contract; or (3) hired after the effective date of the contract and thereafter worked for thirty days. No phrase of section 3(a) can be read as excluding from the class of "employees" those who were not union members, or those who had accrued less than thirty days' service. Fur-

thermore, the language of the section would be meaningless if "employees" were only union members, for the section requires that "employees covered by this Agreement . . . shall, on or after the thirtieth (30th) day following the beginning of such employment, *become and remain members . . . of the Union.*" If all "employees" were union members by definition, this phrase would be meaningless.

Other documents support plaintiffs' position that "employee" is used in the usual sense rather than in the limited manner for which defendant argues. The Trust Agreement, made binding upon defendant by section 23 of the collective bargaining agreement between the Association and the Union, and by section 2(b) of the Memorandum Agreement, does contain a definition clause. Section I, subsection C, of the Trust Agreement defines "employee" as follows:

> The term "employee" as used in this agreement means [1] members of the said Union and/or [2] employees who are eligible *under union rules and regulations for* insurance in accordance with this Declaration of Trust and Trust Agreement, and [3] employees who perform, for any employer who is a party to the collective bargaining agreement with the Union, work which is under the jurisdiction of the Union, and [4] any persons who are eligible under the rules adopted by the trustees as provided in the insurance contracts providing group insurance hereunder.

Plaintiffs claim that the third category, that of persons performing work under the jurisdiction of the union, encompasses workers who have not yet completed their thirtieth day of employment, and hence who are not yet union members. The court agrees with this interpretation. While it is certainly not the best of form to define a term by a phrase that includes that same term, categories [2] and [3] would be wholly redundant if "employee" were synonymous with "union member," since category [1] would have exhausted this group of persons. In addition, category [4] appears to include persons who, though not workers,

are designated as beneficiaries by the trustees. Thus, rather than restrict the definition of "employee" as defendant suggests, the agreements appear to expand the term beyond its ordinary usage.

The court therefore finds that the reading of the contract proposed by defendant—that contributions to the funds are required only for union members—is untenable.

### 2. Parol Evidence

■■ Defendant argues that while the best construction of the various agreements might, as plaintiffs suggest, require contributions on behalf of all workers, the contracts should nonetheless be interpreted not to require payments on behalf of non-members because this was the intention of the parties, as expressed by the representations made by one of the plaintiffs to various of defendant's agents. Specifically, defendant claims that Mr. Georgedes, one of the plaintiff trustees and an official of the Union, explicitly told Mr. Mantegani, the president and co-owner of the defendant corporation, that contributions were required only on behalf of union members. The court permitted defendants to offer testimony as to oral representations made by plaintiffs subject to plaintiffs' motion to strike such evidence on the basis of the parol evidence rule. For the reasons stated below, plaintiffs' motion to strike is granted.

California's Parol Evidence Rule, as amended in 1978, provides in part:

Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement.

Cal.Code of Civ.Proc. § 1856(a) (West Supp. 1979). The rule prohibits the consideration of agreements outside of the writing itself that would contradict the writing where the writing was intended as a final expression of the agreement of the parties. In the present case there is no debate over the finality of the agreement. At issue, therefore, is whether the proffered parol is consistent with the written terms of the agreement. Case law provides further guidance, it having been held that extrinsic evidence is admissible if and only if the agreement "is 'fairly susceptible of either one of the two interpretations contended for.'" *Beckett v. Beckett*, 272 Cal.App.2d 70, 77–78, 77 Cal.Rptr. 134, 139 (1969), quoting *Pacific Gas & Electric Co. v. G. W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 40, 69 Cal.Rptr. 561, 564, 442 P.2d 641 (1968). These cases predate the present statutory formulation of the rule, but the drafters of the latest statute have specifically endorsed the quoted language. See California Law Revision Commission Comment, 1978 Amendment, Cal.Code of Civ.Proc. § 1856 (West Supp.1979).

The court finds that the language of the agreements in question is not fairly susceptible to the construction that defendant seeks. As described above, the construction of section 3(a) of the collective bargaining agreement sought by defendant not only stretches the language beyond what the actual words will bear; it in fact is contradictory to the language of the agreements. In addition, there is abundant support for the plaintiffs' interpretation of the remaining provisions of the agreements to require contributions to the funds on behalf of all workers, whether or not union members. Accordingly, the court may not consider the parol in determining the meaning of the agreement, even as it bears on the intentions of the parties.

### 3. Estoppel

The defendant has, with scattered exceptions, failed to pay contributions on behalf of employees who were not members of the Union from the time it entered into the Memorandum Agreement in May of 1975, until the present. Yet until November of 1978, the plaintiffs failed to protest that contributions were payable on behalf of non-member employees as well as on behalf of Union members. Indeed, this suit was filed solely because defendant failed to make contributions of any kind for several months due to the illness of its bookkeeper.

Defendant claims that plaintiffs' failure to make known its objections sooner estop it to claim that such payments are due and owing now. This defense must also be rejected.

■ The parties agree that the four elements of estoppel are correctly set forth in *Safway Steel Products, Inc. v. Lefever*, 117 Cal.App.2d 489, 256 P.2d 32 (1953), as follows: (1) the party to be estopped must be apprised of the facts; (2) the party to be estopped must have intended his conduct to be relied upon, or must have acted so as to impart a reasonable belief that reliance was expected; (3) the victim of the misrepresentation must be ignorant of the true facts; and (4) the victim must have relied to his detriment.

■ In the present case it is clear that estoppel principles have no application. While the first and third elements are matters of disputed fact, there can be no question that the fourth element is lacking. That is, there has been no detrimental reliance in this case. Defendant claims that had the plaintiffs immediately acknowledged that the contributions were deficient because no contributions were being made on behalf of non-member employees, the defendant would not have continued to omit such payments and thus would not have been subject to liability in the present action. But while the reliance is obvious, it is difficult to determine wherein the detriment lies. For if the plaintiffs had noted the deficiency at the time of the first payment in May of 1975, and defendant had thereafter made contributions on behalf of the non-member employees, defendant would have paid an additional $12,121 to plaintiffs up to the time of the suit. The plaintiffs seek to recover exactly this amount by this action. Thus, the best that defendant can claim is that if it had not been misled—assuming for the moment that it was—it would not owe this money now because it would have already paid the money. Either way, however, defendant has $12,121 less and plaintiffs will have that much more. Hence, there has been no detrimental reliance because there has been no detriment.

In light of this conclusion, it is unnecessary to consider whether the defendant's reliance was reasonable, or to resolve the disputed factual issues regarding plaintiffs' knowledge of the underpayments and defendant's ignorance of the correct interpretation of the contract.

### 4. Attorneys' Fees, Costs, Interest and Liquidated Damages

In addition to seeking $12,121 in delinquent contributions, the plaintiffs seek the following amounts: $1,212 in liquidated damages pursuant to section 23(d) of the collective bargaining agreement and Section II, subsection C, of the Trust Agreement; $1,544.57 in interest; $1,002.10 in auditor's fees, pursuant to Section II, subsection R, of the Trust Agreement; $9,840 for attorneys' fees; and $305.38 in costs.

Costs are not awarded by the court directly, but rather by the Clerk. The procedures for obtaining costs are described in L.R. 265, Local Rules of the United States District Court for the Northern District of California.

The expense of the audit was properly requested under the terms of the Trust Agreement and will be awarded.

■ The amount sought for liquidated damages is specified in both the Trust Agreement and the collective bargaining agreement as being ten percent of the amount of delinquent contributions, and thus $1,212 is properly claimed under these provisions. This stipulation precludes the award of prejudgment interest, however, as the documents involved clearly specify that the parties agree "that the amount of damages resulting from . . . failure to pay in full within the time . . . specified [shall be] ten percent of the amount due . . . ." The parties, by this clause, agreed that ten percent was a proper amount of damages above the amount of unpaid contributions. Such an amount would be advantageous to the trustees where the payment was only a few days or weeks late, but would be advantageous to

the employer where the contributions were years overdue. While the wisdom of such a clause might be questioned, it is clear that the trustees are limited to the ten percent figure specified therein; they certainly may not claim both the liquidated damages amount and the interest, for this would be contrary to the terms of the agreement stating that ten percent *"is the amount of damages resulting . . ."* For this reason, the court grants the amount of $1,212 in liquidated damages and denies the amount of $1,544.57 in prejudgment interest.

The last area of the remedy sought by plaintiffs is attorneys' fees in the amount of $9,840. This figure is computed according to Plaintiffs' Exhibit 9, which was admitted into evidence. Plaintiffs' counsel claims fees at the rate of $75 per hour for a period of 131.2 hours. The court finds this request excessive both as a matter of fact and as a matter of law.

■ On the factual side, $75 per hour is excessive for the work done in a case of this nature. The issues were and are generally straightforward, and no allowance is to be made for contingencies. The contract requires payment only for "reasonable attorneys' fees," and the court finds that a reasonable fee for the services rendered in this case would be $40 per hour.

Secondly, the request for payment of fees for 131.2 hours is excessive as a matter of law. Contractual provisions requiring payments of attorneys' fees present a would-be litigant with a serious dilemma: on the one hand, the defendant sued under a contract with such a provision should, like all other litigants, present those defenses reasonably available, and should pursue them with an appropriate level of vigor. On the other hand, the defendant does so at the risk of losing far more than he may have bargained for in that should he lose, he will be liable not only for the damages sought in the suit on the merits, but in addition for the litigation expenses and attorneys' fees incurred by the plaintiff in rebutting the defendant's own arguments. The court finds this dilemma inequitable.

■ Certainly contractual provisions requiring the party found to be in breach to pay attorneys' fees serve a useful and laudable function, in that they discourage dilatory tactics and encourage compliance with contractual obligations, both policies that this court endorses. At the same time, principles of fairness and justice dictate that the court not interpret such provisions to overreach their usefulness by discouraging good faith and possibly meritorious defenses. The vice in such a provision is obvious: a defendant may be reluctant to interpose a defense that would quite possibly succeed because the potential exposure, should the defense fail, would be too great. Nor is the problem remedied by the fact that a defense that is indeed meritorious will result in a defense verdict, and hence no liability for fees, for the uncertainties will deter some defenses before they can be offered to the court for determination. Thus, the provision might serve in many cases to coerce a defendant into a settlement, or to try a case with something less than the total commitment that the adversary system demands.

The court must therefore strike some balance between the utility of fees clauses in preventing frivolous or dilatory tactics, and the disutility that such clauses serve when they discourage or might discourage the bringing of a possibly meritorious defense. In order to strike this balance, the court must, as a matter of public policy, read into the fees clause an exception to defendant's liability for fees where the fees were incurred in opposing a reasonable good faith defense.

■ In the present case, it is clear that the defense the court rejects as a matter of law must be accepted as a good faith attempt to rebut its liability under the contract. The court makes this finding of good faith based in part upon evidence that, because of the parol evidence rule, the court was precluded from considering when addressing the merits of the litigation. Specifically, the testimony of Mr. Mantegani and of Ms. Robinson, defendant's bookkeep-

er, illustrate the defendant's honest belief that no contributions were required on behalf of employees who were not members of the Union. In addition, the reliance that was ineffective in creating an estoppel has more validity here, where the plaintiffs' silence fortified defendant's belief that contributions were not required on behalf of non-members, which, though not enough to avoid liability for the contributions, does provide evidence that Ro-Mant's belief that the lesser contributions were correct was both reasonable and bona fide. Accordingly, the court holds that defendant is not liable for plaintiffs' attorneys' fees incurred in rebutting defendant's reasonable and good faith defense that payments were not required on behalf of non-member employees.

■ It remains to determine, therefore, which expenses were incurred by plaintiffs in refuting defendant's bona fide defenses and which were incurred in prosecuting the action for delinquent contributions. Since neither party was aware that an issue existed as to unpaid contributions on behalf of non-members until the audit was completed in November of 1978, all fees claimed prior to that time are properly recoverable. The first entry in Exhibit 9 that is directed toward rebutting the defense appears on December 6, 1978, when seven-tenths of an hour were spent researching the alleged oral modifications of the contract. Prior to this entry, all time spent—23.2 hours—is properly chargeable.

■ After this point the computation becomes complicated by the fact that defendant filed a counterclaim, which was later dismissed. As the counterclaim was not essential to the defendant's good faith defense, the rationale described above is inapplicable. The question therefore is simply whether the contract calls for reimbursement for attorneys' fees incurred by the trustees in defending suits brought by employers. It is apparent from the relevant provisions that it does not. In section II, subsection C of the Trust Agreement, it is specified as follows:

If any individual Employer defaults in the making of his or its monthly Contribution, or payments, and/or in the payment of such liquidated damages as may become due, and if the Trustees consult or cause to be consulted legal counsel with respect thereto, or file or cause to be filed any suit or claim with respect thereto, there shall be added to the obligation of the Individual Employer who is in default, reasonable attorneys' fees, accountants' fees, court costs, and all other reasonable expenses incurred in connection with such consultation, suit or claim, or any other efforts to obtain collection of such amounts due, including any and all appellate proceedings therein.

The other applicable provision is subparagraph R of section II, which provides as follows:

An employer shall be liable for all costs, expenses, attorneys' fees and accountant fees incurred by the trustees in connection with efforts to obtain collection of any amount due by such employer to the Fund.

It is apparent from each of these provisions that the fees the trustees bargained to recover were fees incurred in the prosecution of collection actions. Such a purpose would not include defense of a fraud action brought by one who also happened to be an employer from whom collection was sought. Hence, plaintiffs' fees in defending against the defendant's counterclaim may not be recovered under the contractual provisions for fees. Rather, the plaintiffs must bear their own expenses in fending off the allegations against them.

Applying this conclusion to the fees sought by Exhibit 9, the next properly creditable entry appears on January 2, 1979, when 1.3 hours were spent preparing a joint pretrial statement. Also allowable are the following hours: two-tenths of one hour on January 3, 1979, for a conversation with the auditors; eight-tenths of an hour on January 5, 1979, preparing statement of no opposition to defendant's motion for partial summary judgment; one and one-tenth hours on January 8, 1979, drafting pretrial

statement; two-tenths of an hour on January 10, 1979, for letter to the plaintiff; four-tenths of an hour on January 11, 1979, for conversations with defendant's counsel; three-tenths of an hour on January 16, 1979, to draft requests for admissions; one and three-tenths hours on January 17, 1979, for completion of drafting of requests for admissions; one and seven-tenths hours on January 22, 1979, preparing for depositions and attending the pretrial conference; four-tenths of an hour on January 23, 1979, reviewing defendant's interrogatories; eight-tenths of an hour on January 25, 1979, also spent on defendant's interrogatories; three-tenths of an hour on February 1, 1979, for a discussion between client and counsel; seven-tenths of an hour on February 9, 1979, spent on defendant's interrogatories; one and six-tenths hours on February 12, 1979, spent on discovery; four and six-tenths hours on February 13, 1979 attending depositions; two-tenths of an hour on February 14, 1979, discussing case with client; four-tenths of an hour on February 20, 1979, regarding discovery; one and three-tenths hours on March 8, 1979, for trial preparation; one and seven-tenths hours spent on March 9, 12, and 14, 1979, regarding settlement; one and nine-tenths hours on March 16, 1979, for trial preparation; three hours on March 18, 1979, for trial preparation; one and five-tenths hours on March 19, 1979, for settlement discussions and trial preparation; two and seven-tenths hours on March 20, 1979, for trial preparation, three hours on March 21, 1979, on settlement discussions and trial preparation; and one hour on March 22, 1979, for settlement discussions and trial preparation.

 The last four entries require some adjustments. Three and one-half hours were spent on March 23 preparing a witness and drafting the fee request in Exhibit 9. Since preparation of fees is not a fee-generating use of time, half of this request will be disallowed. Therefore, plaintiffs will be credited with one and eight-tenths hours for this date. Plaintiffs list a full, eight-hour day for March 27, 1979, the second day of trial, but that day was only a half-day, so four hours will be disallowed. This leaves four hours of trial on March 27, ten hours on March 26, and four hours of preparation on March 24. Since at least half of these eighteen hours were spent rebutting defendant's good faith and reasonable defenses, only nine hours will be allowed.

Total allowable hours are sixty-six and four-tenths. At $40 per hour, the total fee award is $2,656.

This memorandum opinion shall constitute the court's findings of fact and conclusions of law pursuant to Rule 52(a), Federal Rules of Civil Procedure.