**CHICAGO DISTRICT COUNCIL OF CARPENTERS PENSION FUND, Chicago District Council of Carpenters Welfare Fund and the Chicago District Council of Carpenters Apprentice and Trainee Program, George Vest, Jr., Wesley Isaacson, Milton Holzman, Thomas E. Ryan, Richard S. Pepper, Albert Kaufman, Dominic J. Velo and Herbert S. Church, Jr., as Trustees of the Chicago District Council of Carpenters Pension and Welfare Funds, Richard S. Pepper, Wesley Isaacson, George Vest, Jr., Thomas D. Coleman, Jack Bornh Bornhoeft, Domonic J. Velo, Edward Ellis and Kenneth Borg, as Trustees of the Chicago District Council of Carpenters Apprentice and Trainee Program, Plaintiffs,**

v.

**MONARCH ROOFING COMPANY, INC., Defendant.**

No. 83 C 2974.

United States District Court, N.D. Illinois, E.D.

Nov. 15, 1984.

Albert M. Madden, Hugh J. McCarthy, Rita A. Long, Hugh J. McCarthy & Assoc., Ltd., Chicago, Ill., for plaintiffs.

Jeffrey K. Ross, Joan McAvinn Gale, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ASPEN, District Judge:

This case having been tried without a jury, the Court has heard testimony and reviewed exhibits received in evidence, arguments of counsel, and legal briefs submitted by the parties. Based on the foregoing, we now make the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.*

### Findings of Fact

1. The Chicago District Council of Carpenters Pension Fund, the Chicago District Council of Carpenters Welfare Fund and the Chicago District Council of Carpenters Apprentice and Trainee Program Fund ("the Trust Funds") provide health and welfare, pension and training benefits to carpenters who work within the territorial jurisdiction of the Chicago District Council of Carpenters and its successor, the Chicago and Northeast Illinois District Council of Carpenters ("the Union").

2. Monarch Roofing Company, Inc. ("Monarch") is an Illinois corporation which at all times material to this action has been engaged in the business of installing hot tar roofing, aluminum siding and asphalt roof shingles. In addition, during the winter months, Monarch also installs walls and insulated ceilings.

3. Emil Trimarco has been the President of Monarch since 1969. Before then, the business was run by Carl Fisher, then President of Monarch.

---

* These findings and conclusions are in some instances hybrid; that is, there may be legal conclusions embedded in the statements of facts and facts included in some of the conclusions of law. Where there are mixed questions of fact and law, as in the present case, this is difficult to avoid. Any finding of fact or conclusion of law which is improperly designated should be considered as if it were properly labeled.

4. On or about August 4, 1967, Carl Fisher signed a one-page, two-sided Agreement (the "Hard Card") with the Union on behalf of Monarch. Pursuant to the terms on the Hard Card, Monarch agreed to be bound by (1) the Collective Bargaining Agreement ("CBA") entered into by the Union and the Builders Association of Chicago for the period of June, 1967 through May 31, 1972, and (2) the Trust Agreements which created the Trust Funds.

5. On or about September 21, 1973, Emil Trimarco executed a Hard Card Agreement with the Union. Pursuant to this Agreement, Monarch agreed to be bound by the provisions of a CBA entered into by the Union and the Mid-America Regional Bargaining Association ("M.A.R.B.A.") for the period of June 1, 1973 through May 31, 1975, and to the Trust Agreements which created the Trust Funds.[1]

6. On or about June 11, 1975, Trimarco signed a Hard Card Agreement, again binding Monarch to the CBA entered into by the Union and M.A.R.B.A. and again agreeing to bind Monarch to future CBAs entered into by the Union and M.A.R.B.A.

7. The regular practice of the Union has been to send promptly a copy of the CBA to an employer who signs a Hard Card. There is no evidence that the Union did not follow that procedure with respect to Monarch, but no testimony or other evidence directly shows that the Union did send a copy. Monarch does not now have a copy in its files. However, copies were readily available to Monarch from the Union.

8. Pursuant to the provisions of the CBAs and the Trust Agreements, Monarch must make contributions to the Trust Funds for each hour worked by its carpenter employees at the rate and in the manner specified in the CBA and the Trust Agreements. In addition, the CBA requires Monarch to make contributions to the Trust Funds measured by the hours worked by its subcontractors who are not signatory to a CBA with the Union.

9. Monarch employed seventeen individuals to perform carpentry work during the period of July 1, 1978 through December 31, 1981, or a portion of that period of time. These workers were employed as "trainees" pursuant to a "training program" begun by Carl Fisher and continued by Trimarco. Under this program, after Monarch unilaterally determined that a trainee had developed sufficient skills, Monarch called a Union business agent and told the agent that he had a man who was ready to join the Union. The agent would meet the employee and sign him up as a member of the Union.

10. Monarch made no contributions to the Trust Funds between the period of July 1, 1978 through December 31, 1981, on behalf of the individuals mentioned in Paragraph 9. Section 1.1 of the CBA between

---

1. The Hard Card provided, among other things, that:

2. The parties adopt, and the EMPLOYER agrees to be bound by the terms and conditions of a Collective Bargaining Agreement dated June 1, 1973, between the UNION and Mid-America Regional Bargaining Association as bargaining agent for certain employer associations, a copy of which agreement is attached hereto and made a part hereof and the receipt of which is hereby acknowledged by the EMPLOYER.

3. EMPLOYER agrees to be bound by the terms of the Trust Agreements creating the Chicago District Council of Carpenters Health and Welfare Fund, Chicago District Council of Carpenters Pension Fund, and the Chicago District Council of Carpenters Apprentice Training Fund and all rules and regulations adopted by the Trustees thereof, and agrees to make prompt payments of the per hour contributions provided in the Collective Bargaining Agreement aforesaid, with respect to each such Trust Fund.

4. This agreement, and the agreement adopted by reference as aforesaid, shall be in effect as of June 1, 1973, and remain in effect to and including the expiration date of the agreement adopted by reference. This agreement shall continue in effect from year to year thereafter and the parties specifically adopt any agreement entered into between the UNION and Mid-America Regional Bargaining Association, bargaining agent for certain employer associations, subsequent to the expiration date of the agreement adopted by reference as aforesaid, unless notice of termination or amendment is given in the manner provided herein.

the Union and M.A.R.B.A. includes trainees in addition to regular journeymen in the Agreement. In addition, § 1.1 provided that "shinglers" were covered by the Agreement.

11. During the period of July 1978 through December 1981, the CBAs required signatory employers to make contributions to the Chicago District Council of Carpenters Pension Fund at the rate of $1.08 for each hour worked by its employees who performed bargaining unit work.

12. During the period of July 1978 through December 1981, the CBAs required signatory employers to make contributions to the Chicago District Council of Carpenters Welfare Fund at the following rates for each hour worked by its employees who performed bargaining unit work:

| Period | Hourly Rate |
|---|---|
| July 1, 1978—May 31, 1979 | $ .98 |
| June 1, 1979—May 31, 1980 | 1.08 |
| June 1, 1980—May 31, 1981 | 1.23 |
| June 1, 1981—August 31, 1981 | 1.38 |
| September 1, 1981—December 31, 1981 | 1.43 |

13. During the period of July 1978 through December 1981, the CBAs required signatory employers to make contributions to the Chicago District Council of Carpenters Apprentice and Trainee Program Fund at the following rates for each hour worked by its employees who performed bargaining unit work:

| Period | Hourly Rate |
|---|---|
| July 1, 1978—May 31, 1980 | $.08 |
| June 1, 1980—December 31, 1981 | .10 |

14. The total number of hours worked by the individuals listed in Paragraph 9 during the period of July 1978 through December 1981 that were not reported to the Pension Fund is 12,760.75. Based upon the contribution rate set forth in the CBAs, Monarch failed to pay $13,781.60 (12,760.75 × $1.08 = $13,781.61).

15. Based upon the hours that were not reported to the Chicago District Council of Carpenters Welfare Fund during the period of July 1978 through December 1981, Monarch failed to pay $14,605.36 to the Welfare Fund. This amount was calculated as follows:

| Period | Unreported Hours | Hourly Contrib. Rate | Amount Owed |
|---|---|---|---|
| 07/78 – 05/79 | 2,955.25 | $ .98 | $ 2,896.15 |
| 06/79 – 05/80 | 4,077.25 | 1.08 | 4,403.43 |
| 06/80 – 05/81 | 4,266.50 | 1.23 | 4,247.80 |
| 06/81 – 08/81 | 646.50 | 1.38 | 892.17 |
| 09/81 – 12/81 | 815.25 | 1.43 | 1,165.81 |
| Totals | 12,760.50 | | $14,605.36 |

16. Based upon the hours worked by the individuals listed in Paragraph 9 that were not reported to the Chicago District Council of Carpenters Apprentice and Trainee Program Fund, Monarch failed to pay $1,135.40 to the Training Fund. This amount was calculated as follows:

| Period | Unreported Hours | Hourly Contrib. Rate | Amount Owed |
|---|---|---|---|
| 07/78 – 05/80 | 7,032.50 | $ .08 | $ 562.60 |
| 06/80 – 12/81 | 5,728.00 | .10 | 572.80 |
| Totals | 12,760.50 | | $1,135.40 |

17. Monarch's failure to contribute to the trust funds was consistent with its prior practice. No contributions were made for trainees. Once Monarch determined that a trainee had sufficient skills to be placed in the Union, however, Monarch began making the contributions for that employee. No one ever told Monarch that this practice violated the CBA.

18. Monarch's failure to contribute to the Trust Funds on behalf of trainees was discovered in an audit which took place in May 1982. The Trust Funds had engaged the Certified Public Accounting firm of Costin, Cahill and Egan to review the books and records of Monarch to determine whether Monarch had fully complied with its obligation to make contributions to the Trust Funds during the period of July 1, 1978 through December 31, 1981. The auditors' report, dated May 28, 1982, indicated that additional contributions were owed to the Trust Funds. This report is the basis of the plaintiffs' claim in this case. After this audit, Monarch terminated its trainee program.

19. The Trust Funds audit employers on a regular basis. Once an employer has been selected for an audit, the auditor re-

views all the monthly employer contribution reports received by the Trust Funds from the employer during the period to be audited. The monthly employer contribution reports are completed by the employer. The reports list employees, their hours worked and the amount owed to the Funds. Then, in what is usually an on-site visit, the auditor reviews various records including the employer's payroll records, time cards, payroll tax reports and unemployment compensation records.

20. In determining what individuals to include on his report, the auditor assumes all employees who have had contributions made on their behalf by the employer have been performing bargaining unit work. Next, the auditor eliminates other employees whose names appear in the employer's records who clearly do not do bargaining unit work. Finally, the auditor investigates any remaining names on the list.

21. To investigate the remaining names, the auditor begins by checking whether those names appear on the Trust Funds' microfiche records. The microfiche records contain the names of all individuals for whom contributions to the Trust Funds have been made in the past because they did bargaining unit work. Such past contributions indicate that the employee is very likely still doing bargaining unit work.

22. The auditor next looks at the employee's pay scale to determine whether the employee is being paid at the rate paid to Union carpenters. Where the employee is receiving Union scale, this would also indicate that the employee was probably doing bargaining unit work.

23. Finally, if the auditor is unable to determine whether the employee is doing bargaining unit work from the records, he will ask the employer to explain what work the employee performs. If the auditor is still not satisfied, he reports that employee to the Trust Funds as a "discrepancy," i.e., someone for whom contributions may be owed, or he lists the individual in his report as an "unverified employee." The audit is then reviewed, usually by Robert Cahill, the supervising partner in the auditing firm and then submitted to the Trust Funds. When the audit report is received by the Trust Funds, it is assigned to an audit coordinator.

24. During the period of July 1, 1978 through December 31, 1981, Monarch paid its employees who installed shingles on a piecework rather than hourly basis. The piecework rate varied depending on the difficulty of the job. The CBA prohibits payment of wages on a piecework basis.

25. During the period of July 1, 1978 through December 31, 1981, Monarch submitted monthly contribution report forms to the Trust Funds. On its report forms, Monarch reported eight hours for each day a journeyman shingler worked regardless of the number of hours the individual actually worked.

26. When they prepared their report and their findings in Paragraphs 12–16 above, the Trust Funds' auditors divided the gross amount paid to the defendant's employees during the audit period by the wage rate the employees were paid for their non-shingling work or the wage rate required to be paid by the CBAs. This has been the Trust Funds' standard procedure where an employer has not kept track of the hours worked by its employees. With respect to the employees for whom the defendant did make contributions, the auditor's method indicated that over a three year period, the defendant's method of calculation resulted in the underreporting of only twenty-two hours.

27. On three previous occasions[2] the Trust Funds had hired Costin, Cahill and Egan to audit Monarch's records to see whether Monarch had complied with its duty to contribute to the Funds. On each occasion the auditors found either no discrepancy or relatively small discrepancies

---

2. The first audit took place in February 1975, reviewing the period of April 1, 1973 through September 30, 1975. The second audit, concluded on October 31, 1977, reviewed the eighteen-month period from January 1, 1976 to June 30, 1977. The third audit reviewed the one-year period running from July 1, 1977 through June 30, 1978.

between the amount of hours reported by Monarch and the amount calculated by the auditors. On none of the auditors' reports to the Trust Funds did the auditors indicate that Monarch maintained a training program under which it was not contributing to the funds. No evidence suggests that the Trustees had any direct knowledge of Monarch's training program.

28. After the third audit, Monarch appealed the discrepancy. It disputed that it owed contributions for a trainee named "Miedaner," whose hours had not been reported during that audit period. In appealing, Trimarco signed an affidavit stating that Miedaner "never performed work for [Monarch] within the jurisdiction of the [Union] as set forth in the Collective Bargaining Agreement." The affidavit also stated that Miedaner performed "warehouse maintenance and roof repairs while also attending college part time." The affidavit did not disclose that Miedaner was a trainee. On the basis of this affidavit, the Trust Funds readjusted the discrepancy.

29. Trimarco never disclosed the training program to the trustees, and the trustees never explicitly approved of the program.

### Conclusions of Law

1. This action was brought under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132 and 1145. Our jurisdiction stems from 29 U.S.C. § 1132(e)(1).

2. Monarch's failure to contribute to the Trust Funds based upon the hours worked by its "shingler-trainees" breached the CBA to which it was bound. The Agreement specifically and unambiguously applies to "Shinglers" (§ 1.1) and "Trainees,"

and requires contributions on behalf of all covered employees performing such work. *See* CBA, Articles XII, XIII, XIV.

3. As we held earlier in this case in denying the cross-motions for summary judgment, Monarch may attempt to invoke the doctrine of estoppel as a defense.

■ 4. The estoppel doctrine prescribes three requirements: (1) The Trust Funds words or conduct must have led Monarch to take some action it would not otherwise have taken but for the actions of the Funds; (2) Monarch must have actually and reasonably relied on the Trust Funds' action, and it must not have known of or had access to facts contrary to those on which it relied; (3) Monarch's reliance must have caused it harm. *Matter of Pubs, Inc. v. Champaign,* 618 F.2d 432, 438 (7th Cir. 1980).

■ 5. As set forth below, Monarch has failed to satisfy the second and third estoppel requirements. Accordingly, we need not decide whether the auditors were agents of the Trust Funds such that their failure to discover the training program in the first three audits can be imputed to the Funds. As noted above, the Funds had no actual knowledge of the training program.

6. Even if Monarch relied on constructive words or conduct of the Trust Funds, we do not believe that Monarch's reliance was reasonable. First, Monarch knew that in general it was bound by a CBA,[3] and that under the Agreement, it was required to make Trust Fund contributions of some kind. At the very least, it was unreasonable for Trimarco, a successful businessman for fifteen years, to have not read the Agreement in order to understand his obligations. We think it unlikely that Monarch never received a copy of the Agreements,[4]

---

**3.** Trimarco admits that he signed the Hard Card, but denies that he ever agreed to be bound by any of the CBAs, including the provisions requiring contributions to the Trust Funds. As noted above in Paragraph 5, by signing that Hard Card, Trimarco unequivocally bound Monarch to the terms of the CBAs. In any event, Trimarco's conduct is inconsistent with his position now. He denies being bound to any agreements, but admits complying with

those agreements by contributing to the Trust Funds for his journeymen and by submitting to audits. We find that by signing the Hard Cards, Trimarco bound Monarch to the whole of those agreements, not just selective provisions.

**4.** Trimarco testified at his deposition that he did not remember whether he ever received a copy. At trial, he testified that he did not, concluding so because after the deposition he did not find

and that it did not know of its obligations under them. But even if it had not received any copies, it had ready access to them, and thus had easy access to facts contrary to those on which it might have relied. Those contrary facts are plain from the Agreements. Section 1.1 of the CBA states: "The Bargaining Unit shall consist of all Journeymen, Foremen, Apprentices, and Trainees..." Articles XII, XIII and XIV mandate Trust Fund contributions on behalf of "Employees who are covered by this Agreement." A reasonable businessman would have made sure to read these provisions or seek an attorney's advice about the Agreement.

7. Second, it was unreasonable for Monarch to believe that it could unilaterally decide when to begin contributions on behalf of an employer. Under Monarch's "training" program, Trimarco controlled when a worker went from "trainee" to "Union-man," even though both are Union-men under the CBAs. Thus, Trimarco controlled the time when contributions were to begin. It was unreasonable—if not intentional—for Monarch to conclude that it, and not the Agreement, could determine when to begin contributing to the Trust Funds on behalf of an employee.

8. Third, it was unreasonable for Monarch to rely on the events surrounding the "Miedaner affidavit" as indicating that the Trust Funds acquiesced in the training program. First, it was unreasonable for Trimarco to assert under oath in the affidavit that Miedaner did not perform Union work under the CBA when, if Trimarco is to be believed, he never read the Agreement. More significantly, we think Trimarco led the Trust Funds to believe that Miedaner had performed non-carpentry work, rather than disclosing to them that he was a trainee. Trimarco stated Miedaner was exempt from contributions for performing "warehouse maintenance and roof repair," not for—as Trimarco says he believed—being a trainee. We find that the Trust Funds therefore concluded that Miedaner had performed either little or no carpentry work and on that basis ruled in Monarch's favor. If Trimarco believed that trainees were exempt from contribution, we believe he would have said so.[5] Thus, we conclude that Monarch bears responsibility for the Trust Funds' prior ignorance of the trainee program. If it did not cloak the program from the Trust Funds, at the very least it unreasonably concluded that the Trust Funds' acceptance of that affidavit constituted knowledge of and acquiescence in the trainee program.

9. We are also unpersuaded that Monarch suffered any significant harm, even if the other estoppel requirements were present. The Trust Funds seek contributions only from the last audit period, not from earlier periods. If the Funds had discovered the discrepancies sooner, Monarch would have had to pay for that earlier period. Now it is being asked to pay for a later, rather than earlier, period.[6] Either

---

any copies in his files. But as noted earlier, the Union's regular practice was to send copies to every signatory of a Hard Card. We think it unlikely that the Union twice failed to send an agreement to Monarch. Indeed, Monarch implicitly admitted that it was familiar with the CBA when it signed the Miedaner affidavit. However, since we find that Monarch had convenient access to the Agreement, its actual familiarity with the Agreement is not necessary to the outcome of the case.

**5.** Trimarco admits that he did say so to the auditors during the 1977 audit. When asked about certain trainees whose job categories were ambiguous from the records, Trimarco told the auditor that each trainee "isn't Union. The man is training." The auditor then removed those employees from the discrepancy list. As a result, the Trustees did not directly learn then of the training program. This statement suggests that Trimarco either believed that trainees were exempt from contribution or tried to hide the trainees from the Trustees. If it was the former, we think Trimarco would have later told the Trustees that Miedaner was a trainee. In that case, as noted in the text, his failure to do so made his reliance on the Miedaner incident unreasonable. If it was the latter, he is guilty of "unclean hands" and is not entitled to equitable relief in any event. Thus, in either case, Monarch does not have a right to equitable estoppel.

**6.** If the Trust Funds were seeking contributions from the earlier audit periods as well, Monarch might have had a stronger argument about harm.

way, Monarch pays for one period following its discovery in the audit. *Cf. Markt v. Ro-Mart, Inc.,* 471 F.Supp. 1292, 1298 (N.D.Cal.1979). It is true that this last audit period is longer than each of the earlier ones. But Monarch has also enjoyed the benefit of employing "Trainees" for many years without contributing to the Funds on their behalf. It also enjoyed the benefit of employing these Trainees on a piecework basis, rather than the hourly basis mandated by the CBAs.[7] On balance, then, we do not find that Monarch has suffered harm warranting an equitable defense.

10. Because Monarch has failed to make the contributions required of it by the CBAs, and because it has failed to make out an estoppel defense, the Trust Funds are entitled to judgment. 29 U.S.C. §§ 1132(g), 1145.

11. In ascertaining the proper amount of unpaid contributions, we find that the methods employed by the auditors to calculate the actual hours worked were reasonable under the circumstances, especially given Monarch's failure to keep track of the actual hours worked by its employees. We also find that these methods were accurate, considering that over the last audit period the methods revealed that Monarch had underreported only twenty-two hours for those employees for whom it made contributions.

12. The Trust Funds are entitled under 29 U.S.C. § 1132(g)(2)(A) to the unpaid contributions set forth in Paragraphs 14–16 above, that is, a total of $29,522.37.

13. In addition, the Trust Funds are entitled to (1) the greater of double interest on the unpaid contributions or liquidated damages plus interest on the unpaid contri-butions; and (2) reasonable attorneys' fees and costs of the action. 29 U.S.C. § 1132(g)(2)(C) and (D).

### Conclusion

For the foregoing reasons, the Court finds that the Trust Funds are entitled to judgment in the amount of $29,522.37, plus interest and/or liquidated damages, plus reasonable attorneys' fees and costs. The Trust Funds are to submit a fee petition on or before November 20, 1984. The petition shall include a calculation of the amount of interest or liquidated damages to which it is entitled under 29 U.S.C. § 1132(g)(2)(C). Monarch may respond by November 30, 1984. It is so ordered.

---

7. Piecework wages clearly benefitted Monarch. If—as Monarch assumes in its briefs—a trainee works half as efficiently as a journeyman, it pays that trainee half of what a journeyman would earn on a piecework basis. When this wage rate is combined with its savings from not contributing to the Funds on behalf of trainees, it becomes clear that Monarch substantially reduced its hourly labor costs through its use of the training program. Thus, Monarch did not suffer any substantial harm because of the Trust Funds' belated discovery of the training program. Rather, it no longer can continue to reap the benefits of its former cheap labor practices. Once again, if the Funds were seeking reimbursement for all the past audit periods, Monarch might have been harmed because it might have ended up paying more than if it had no training program. But so long as the Funds are seeking contributions only from the last audit period, we do not think Monarch has been harmed overall.