940 F.2d 665
 UNPUBLISHED DISPOSITION
NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
CITY AND SUBURBAN DISTRIBUTORS, ILLINOIS, INC., Plaintiff-Appellant,
v.
STROH BREWERY COMPANY, Defendant-Appellee.
 No. 90-2156.
 United States Court of Appeals, Seventh Circuit.
 Argued Jan. 24, 1991.
Decided Aug. 2, 1991.
Rehearing and Rehearing En Banc Denied Sept. 10, 1991.
 
 Before WOOD, JR., and RIPPLE, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.
 
 ORDER
 
 1
 Stroh Brewery, the defendant, moved for summary judgment alleging that according to a settlement agreement between the parties the case should be dismissed. City and Suburban Distributors (C & S), the plaintiff, argued that such a settlement agreement did not exist. The district court granted Stroh's motion for summary judgment. C & S appealed.[1]
 
 
 2
 In March, 1984, C & S entered into a Wholesaler Agreement with Stroh. The agreement entitled C & S to distribute Stroh products in the south and central portions of Chicago. Stroh products accounted for approximately two-thirds of C & S's total sales.
 
 
 3
 In September, 1986, Stroh attempted to terminate C & S's distribution rights because C & S had entered into a security agreement which gave one of C & S's creditors certain rights to control the financial operations and the day-to-day management of C & S. C & S filed a suit in state court to enjoin the termination. On September 15, 1986, Stroh and C & S resolved this suit by entering into a letter agreement. Upon execution of this agreement, C & S terminated its lawsuit. The letter agreement provided that Stroh would reinstate the Wholesaler Agreement for ninety days and that during those ninety days C & S would use its best efforts to find a purchaser for all of its assets. If C & S did not sell its assets to a purchaser approved by Stroh by December, 12, 1986, the Wholesaler Agreement was to be automatically surrendered to Stroh for a sum agreed upon in 1985. At oral argument, we were told that this sum was 2.5 to 3 million dollars. The parties extended the letter agreement three times so that it was finally due to expire on February 13, 1987. Stroh sent C & S a letter or mailgram clearly confirming each extension.
 
 
 4
 While the letter agreement was in effect, C & S negotiated with four parties. C & S asked Stroh to approve two parties, Vierk Distributing Company (Vierk) and Nelson Carlo Enterprises, Inc. (Carlo), but Stroh rejected them both, at least partially because neither company was owned by an African-American.[2] Stroh insisted that C & S negotiate with Beverage Affiliates, Inc. which was owned by Thomas Rand, an African-American, but Rand's offer was not as good as the Vierk and Carlo proposals.
 
 
 5
 C & S did not sell its distributorship by February 13, 1986, and it brought a second suit seeking injunctive relief from the Circuit Court of Cook County. C & S's complaint requested a declaratory judgment that Stroh's refusal to approve buyers was not commercially reasonable, an injunction preventing Stroh from terminating C & S's distributorship under the letter agreement, and an injunction directing Stroh to approve the three bidders which C & S had submitted to Stroh.[3] Stroh removed the suit to the federal court. On March 12, 1987, Judge Getzendanner granted C & S's motion for a preliminary injunction because C & S had demonstrated a "high degree of likelihood of success" on the merits on the ground that Stroh depended on race-based factors to reject the Vierk and Carlo proposals. The preliminary injunction, entered March 16, enjoined Stroh from terminating the Wholesaler Agreement or from interfering with C & S's rights under it. Judge Getzendanner's order also provided that the injunction would not affect the rights and obligations of the parties under the September 15 letter agreement. C & S immediately resumed negotiations with Rand and with Vierk which was approved by Stroh after the entry of the preliminary injunction.
 
 
 6
 The parties dispute the significance of various events from March 16 to June 1, 1987.
 
 
 7
 On March 16, Judge Getzendanner entered the preliminary injunction and set the trial for April 6. She made some remarks which were not recorded, but which evidently addressed the desirability of a prompt sale of C & S's business. Stroh's version is that "the Court suggested that the parties resolve the matter by permitting C & S to attempt to work out an asset purchase agreement with one of the four candidates involved in the case, or any other potential candidate then in the wings. The Court suggested that C & S be given three weeks, until April 6, 1987, the trial date, to accomplish this, and that if a transaction was not completed by that time, the letter agreement of September 15, 1986, was to be operative." Emergency Motion of the Stroh Brewery Company to Dissolve Preliminary Injunction and to Dismiss the Action at 1. C & S's understanding was that "the Court would seriously consider entering a final order which involuntarily dismissed this action in the event that C & S did not consummate a sale in a reasonable time on the ground that a reasonable time to consummate a sale was all of the relief to which C & S was entitled." Affidavit of Mr. Franch, June 11, 1987.
 
 
 8
 On March 23, Mr. Aufderstrasse, Stroh's counsel wrote to Mr. Franch, then counsel for C & S, with a copy to Judge Getzendanner. The letter read,
 
 
 9
 This is a followup to our telephone conversation last Wednesday in which I indicated to you that as a part of Stroh's effort to settle the pending action, Stroh intends to approve the Vierk Distributing Company as a buyer of Stroh distribution rights for all of C & S' territory. By this action, Stroh is accepting in principle the proposals which Judge Getzendanner outlined at the last two conferences which we had with her, namely, that C & S be given three weeks, until April 6, to arrange a transaction with one or more of the four buyers already identified, and possibly one other in the wings, and that if such a transaction is arranged with a buyer acceptable to Stroh, without regard to race, the case will be dismissed. If, however, a transaction cannot be arranged with a buyer acceptable to Stroh, C & S will relinquish the Stroh Franchise Agreement and Stroh distribution rights, Stroh will be liable only for the previously agreed sums, and the case will be dismissed. Stroh's action last Wednesday has given C & S approval of two candidates, Vierk Distributing and Affiliated Beverages, Inc. owned by the Rands. We understand that C & S is already holding conversations with these potential purchasers and others. Stroh's acceptance of Judge Getzendanner's suggestion is for settlement purposes only.
 
 
 10
 If this approach is satisfactory to your client, it would seem to us that we seek a conference with Judge Getzendanner as soon as possible so that we can all minimize trial preparation costs. In this connection, I am enclosing some additional discovery requests which we will need prior to the trial. We will, of course, continue them if we can work out an agreeable timetable with Judge Getzendanner. Your prompt response to this letter will be appreciated.
 
 
 11
 The record contains a minute order which discloses that there was a pretrial conference held March 30 at which a status hearing was set for April 9 and trial for April 16. The order makes no reference to a settlement and no stenographic record of the conference was made. Stroh interprets its March 23 letter as an offer of settlement and contends that C & S accepted the offer by appearing at the conference. Stroh finds confirmation in later instances when Mr. Aufderstrasse referred to an agreement and Mr. Franch did not take issue.
 
 
 12
 On the basis of inferences from the circumstances Magistrate Judge Lefkow and Judge Nordberg concluded that the terms of the March 23 letter must have been accepted by C & S. Alternatively, they were satisfied that Mr. Franch's failure to dispute Mr. Aufderstrasse's references to an agreement estopped C & S from denying its existence.
 
 
 13
 As will be evident from discussion of the facts, we conclude that while the inferences drawn by the magistrate and judge as to formation of an agreement are doubtless reasonable, other reasonable inferences could be drawn to support the position of C & S that there was no agreement to dismiss if a sale was not made by a specified date. Moreover, a flat sworn denial by C & S's CEO and counsel that they had agreed to the March 23 terms left a genuine issue of fact for trial.
 
 
 14
 Summary judgment could not, we think, properly have been granted, whatever resolution of the issues a trier of fact might have reached from the same evidence produced at trial.
 
 
 15
 Undoubtedly there must have been communications between counsel in arranging the March 30 conference. Neither party has represented what those communications were or what was said at the conference. Mr. Wallace, CEO of C & S, has denied under oath that he assented to the terms of the March 23 letter, and Mr. Franch has denied under oath that C & S agreed to consummate a sale by a particular date.
 
 
 16
 We do not view C & S's participation in the March 30 conference, without more, as an acceptance of the terms in the first paragraph of the March 23 letter. The second paragraph of the letter does not call for appearance at a conference as an unequivocal act of acceptance. See Vincent DiVito, Inc. v. Vollmar Clay, 179 Ill.App.3d 325, 534 N.E.2d 575, 578 (1989). C & S may well have attended a conference for discussion of settlement, or for the purpose of delaying the trial date, which did in fact occur. Had an agreement to dismiss at a certain date been made at the conference, Judge Getzendanner would very likely have made a record of it. Stroh's counsel wrote a letter to Mr. Franch on April 1 in which he characterized the March 30 conference as "discussions ... relating to the disposition of the captioned lawsuit." The letter went on, in part, "We agreed with you to suggest to the Court that the trial date be set over and a status conference be set next week in order to give C & S time to effectuate the sale of its assets. We did not agree to an open ended extension of the April 6 date suggested by the Court and contained in my letter of March 23, 1987." It is difficult to interpret this letter as a confirmation of any agreement except to delay the trial. Setting and resetting a trial date sounds to us as if the consequence of failure to sell by some deadline would be trial, not agreed dismissal.
 
 
 17
 A minute order of April 9 shows that the status hearing was held and continued to April 20 and the trial date of April 16 was stricken. No stenographic record was made. A minute order of April 20 shows that the status hearing was held and "Settlement hearing set for April 23, 1987 at 9:30 a.m." The April 20 transcript shows that Mr. Franch reported that contracts would be submitted the next day to two possible buyers and hopefully one or both would sign. Nothing indicates that any agreement had been made, or any reason why the next hearing was called a settlement hearing.
 
 
 18
 A minute order of April 23 shows "Settlement hearing held. Settlement hearing continued to May 5, 1987 at 9:30 a.m." The transcript shows that Mr. Franch reported on drafts which contained a closing date of May 29. Mr. Aufderstrasse objected that "if they can't get the deed done much prompter, I think we are entitled under our agreement to a dismissal of this case ..." Mr. Franch took no exception to the reference to "our agreement," but said he did not see anything unreasonable about the date.
 
 
 19
 On April 24, Mr. Aufderstrasse wrote Mr. Franch. In the course of the letter he stated that a sale agreement must be signed no later than May 5, "or we will apply to Judge Getzendanner to dismiss the case, pursuant to the settlement terms under which we have been operating." Mr. Franch's affidavit, filed June 11, 1987, asserted that he attempted unsuccessfully to telephone Mr. Aufderstrasse to inquire about the reference to settlement terms. At the hearing on May 5, however, Mr. Franch said nothing to question the statement about "settlement terms."
 
 
 20
 Mr. Franch's silence in the face of Mr. Aufderstrasse's April 23 reference to "our agreement" and his April 24 reference to "the settlement terms under which we have been operating" seem to have been quite persuasive to both Magistrate Judge Lefkow and Judge Nordberg in deciding that there was no genuine issue of fact concerning the existence of the settlement agreement alleged by Stroh. However, Mr. Franch's failure to respond to these statements does not prove there actually was a settlement agreement. In his affidavit, Mr. Franch states that he thought that the April 24 letter referred to the September 15 letter agreement.
 
 
 21
 The May 5 transcript shows no express reference to an agreement for dismissal, but does show that at one point Judge Getzendanner sent the lawyers out to "Talk a little bit about what the date [for a sale] ought to be, see if you can agree on the date. Obviously it has to be soon."
 
 
 22
 Ultimately, on June 1, Mr. Franch reported that the expected purchaser had backed out. Mr. Aufderstrasse said, "We were operating under an agreement, Mr. Franch, that you had three weeks to sell the distributorship. That has been extended by our agreement and so on." Mr. Franch responded, "What agreement are you talking about? I don't know what agreement you are talking about."
 
 
 23
 Judge Getzendanner said, "Well, we have had several informal agreements, otherwise, we wouldn't be here today." Mr. Franch responded, "... I don't think we ever had an agreement, Judge, that we would sell within a period of three weeks as Mr. Aufderstrasse said. I don't know of any such agreement. I know we have agreed to extend the trial date to attempt to consummate a deal."
 
 
 24
 On June 5, Stroh filed a motion to dissolve the preliminary injunction and to dismiss the action. The motion covered the facts already referred to, but did not describe any communication by C & S of an acceptance of Stroh's March 23 proposal, only that "the parties operated under that proposal." Oddly, although the March 23 proposal called for payment by Stroh of a substantial sum of money if a transaction could not be arranged, the motion made no reference to that obligation.
 
 
 25
 C & S's response included a sworn denial of the alleged agreement. There was never a ruling on the motion. In 1988, C & S made a sale and filed a second amended complaint alleging in substance that by relying on race to reject potential buyers Stroh breached its contract with C & S, violated state and federal laws, and caused C & S 3.25 million dollars in damages.
 
 
 26
 Stroh responded with the motion for summary judgment now before the court.
 
 
 27
 After trial a trier of fact might well decide to draw the inferences drawn by the magistrate judge and the district court. It would be free to determine the credibility of the denials by the CEO and counsel of C & S. On a motion for summary judgment, however, the record would support conflicting inferences and, in any event, contains the sworn denials which are not inherently incredible. Thus there remains a genuine issue of fact whether there was an agreement to dismiss in the absence of sale by some certain date.
 
 
 28
 Stroh's alternative argument is that C & S is estopped from denying the existence of a settlement agreement. In order for equitable estoppel to apply three requirements must be met:
 
 
 29
 (1) [C & S's] words or conduct must have led [Stroh] to take some action it would not otherwise have taken but for the actions of [C & S]; (2) [Stroh] must have actually and reasonably relied on [C & S's] action, and it must not have known of or had access to facts contrary to those on which it relied; (3) [Stroh's] reliance must have caused it harm.
 
 
 30
 Chicago Dist. Council of Carpenters Pension Fund v. Monarch Roofing Co., 601 F.Supp. 1112, 1117 (N.D.Ill.1984). Equitable estoppel must be proved by "clear, precise and unequivocal evidence." Joliet Mass Transit Dist. v. Illinois Fair Employment Practices Comm'n, 85 Ill.App.3d 270, 407 N.E.2d 80, 83 (1980).
 
 
 31
 Assuming there was no acceptance by C & S of the terms of Mr. Aufderstrasse's March 23 letter, but assuming there was a basis for a good faith but erroneous belief by Mr. Aufderstrasse that there had been, then the claim of estoppel must be based on Mr. Franch's failure to take issue with Mr. Aufderstrasse's indications that an agreement between them existed. Even assuming that the circumstances put Mr. Franch under a legal duty to speak, see Joliet Mass Transit, 85 Ill.App.3d 270, 407 N.E.2d at 83, we think the claim of estoppel must fail. Stroh's claim that it suffered detriment depends in substantial part on its forgoing an appeal from the preliminary injunction. Yet its time for appeal expired April 15, 1987, and the assertions which Mr. Franch failed to deny occurred on April 23 and 24. Necessarily, Stroh did not rely on Mr. Franch's lack of response in deciding not to appeal. Similarly, Stroh could not have been harmed by the delay of trial because by April 23 and 24, there was no set trial date or any other indication that the case would proceed immediately to trial.
 
 
 32
 The judgment appealed from is REVERSED and the cause REMANDED for further proceedings.---------------
 
 
 
 [1]
 Jurisdiction was based on diversity of citizenship. Both parties assume that Illinois law governs substantive questions
 
 
 [2]
 At the preliminary injunction hearing, Stroh presented evidence that it believed race was a proper factor under the contract because race had been a factor in the past in C & S's territory and because it is important for a brewer to have a distributor who is a member of the dominant population in the distributor's territory
 
 
 [3]
 On March 4, 1987, C & S filed an amended complaint which added civil rights claims against Stroh