NORTHWEST ADMINISTRATORS,
INC., Plaintiff,

v.

SACRAMENTO STUCCO,
et al., Defendants.

No. C 96–2998 JL.

United States District Court,
N.D. California.

Feb. 14, 2000.

Michael J. Carroll, Timothy A. Charshafjian, Erskine & Tulley, San Francisco, CA.

Philip A. Wright, Kronick Moskovitz Tiedemann & Girard, Sacramento, CA.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER TRIAL

LARSON, United States Magistrate Judge.

### INTRODUCTION

This case was tried by the Court on October 27 and 28, 1998. Michael J. Carroll and Timothy A. Charshafjian appeared on behalf of Plaintiff Northwest Administrators, Inc. ("Plaintiff"), and Philip A. Wright appeared on behalf of Defendant Sacramento Stucco Co. ("Defendant"). Following the trial, both sides filed proposed Findings of Fact and Conclusions of Law on January 21, 1999. Defendant filed an Opposition to Plaintiff's Proposed Findings on February 5, 1999, and the case was submitted.

### PROCEDURAL BACKGROUND

This action concerns a dispute over contributions by employer Sacramento Stucco ("Defendant") to the Western Conference of Teamsters Pension Fund (the "Trust Fund") between 1992 and 1995, pursuant to Defendant's collective bargaining agreements with Teamsters Local Union No. 150 (the "Union"). The Trust Fund is administered by Plaintiff. Plaintiff seeks $218,434 in unpaid contributions, liquidated damages, costs and attorneys' fees.

Sacramento Stucco and the Union have entered into collective bargaining agreements since 1977. The 1990 and 1993 collective agreements (collectively the "CBAs"), are the subject matter of this breach of contract dispute. The CBAs required Sacramento Stucco to make per hour pension contributions to the Trust Fund on behalf of covered employees in the collective bargaining unit. The agreement lists nine job classifications. In addition, the CBAs bind Defendants to the Agreement and Declaration of Trust for the Western Conference of Teamsters Pension Trust Fund ("Trust Agreement"). Plaintiff seeks contribution payments for employees it claims were covered by the CBAs. Defendant claims the employees were not covered.

The parties consented to the jurisdiction of a magistrate judge and a motion for summary judgment was heard by Hon. Joan S. Brennan. She denied the motion on December 8, 1997. On December 17, 1997, Magistrate Judge Brennan referred the case for reassignment, in light of her

imminent retirement, and the case was assigned to this Court. At a subsequent hearing on motions in limine, the parties invoked the law of the case doctrine with respect to various aspects of Magistrate Judge Brennan's prior Order. This Court found that the law of the case doctrine did not apply, since the previous decision had been issued without articulation of the underlying reasoning. *U.S. v. Houser,* 804 F.2d 565 (9th Cir.1986) (A summary disposition, without a reasoned analysis reflecting the authorities or argument which led court to rule as it did, requires greater care in scrutiny of merits.) *Id.* at 567.

This Court then reconsidered the issues, and ruled on the parties' motions in limine in an order filed October 21, 1998.

## FINDINGS OF FACT AT TRIAL

1. Lewis Winchell owns Sacramento Stucco. RT[1] 271:24–272:3.

2. Mr. Winchell signed the 1990–1993 and 1993–1996 CBAs on behalf of Sacramento Stucco. RT 272:12–20.

3. Mr. Winchell signed the 1990–1993 and 1993–1996 E–U's[2] on behalf of Sacramento Stucco. RT 272:12–20; 306:24–18.

4. The E–U's bind Sacramento Stucco to the Western Conference of Teamsters Agreement and Declaration of Trust. Exhibits 4 and 5.

5. Section 7 of the 1990–1993 and 1993–1996 CBAs, "Pension" requires Sacramento Stucco to make pension contributions "... for each employee in the collective bargaining unit covered by this Agreement...." Exhibits 1 and 2.

6. Section 3 of the 1990–1993 and 1993–1996 CBAs, "Wages" lists nine job classifications. They are: clerks; drivers; material handlers; three-axle trucks drivers; fork lift or carrier drivers; semi-truck, truck and trailer, doubles and Stratolift; boom truck and ten-wheel crane; truss fabricators; and working foremen. Exhibits 1 and 2.

7. Pension contributions were due for all employees in the collective bargaining unit. RT 51:10–14; 69:14–18; 108:14–110:17; 144:16–145:19; Exhibit 8.

8. The 1983–1986 CBA is identical to the 1990–1993 and 1993–1996 CBAs in all relevant aspects. RT 196:18–23; 199:2–200:7.

9. Mr. Winchell testified that the collective bargaining unit, at least from 1983–86, consisted of the job classifications in which people were working, including three of the same job classifications listed in the wages section of the 1983–1986 CBA. RT 276:16–278:3.

10. Defendant never negotiated directly with Local 150 to limit contributions to working foremen, as such. However, the four individuals in that classification, Dave Elder, Buford ("Sam") Hunt, Cal Fuller and Norton Holstrom, told the Union representative that they did not want to be in the same bargaining unit as the employees they supervised. RT 315:11–316:11; 317:2–318:20; 347:17–348:12.

11. Defendant and Local 150 had a side agreement, not disclosed to the Trust Fund, to limit contributions to Elder, Hunt, Fuller and Holstrom. Exhibit 28; RT 108:14–110:17.

12. Defendant assumed that the 1990–1993 and 1993–1996 CBAs were limited to working foremen although Plaintiff was not aware of Defendant's assumption until after the audit. RT 347:17–348:12.

13. Mr. Winchell bought Western Stucco in 1985. RT 321:7–14.

14. Western Stucco operates out of the same Riske Lane location, has the same officers, shares the same mailing address and has the same ownership as does Sac-

---

1. "RT" shall signify Reporter's Transcript, numbers the page and line(s).

2. In the case at bar, the union and the employer signed an Employer–Union Certification (E–U) in conjunction with each collective

bargaining agreement. The E–U's bind the Defendant to the Agreement and Declaration of Trust for the Western Conference of Teamsters Pension Trust Fund (the "Trust Agreement").

ramento Stucco. RT 111:13–112:1. Until 1997 Western Stucco had a plant and employees in Oakland.

15. Defendant did not report Western Stucco employees to Northwest even though they performed work in one or more of the job classifications listed in the 1990–1993 and 1993–1996 CBAs. Exhibit 8.

16. The 1990–1993 and 1993–1996 CBAs and E–U's were reviewed by Northwest, in accordance with its New Accounts Procedure Manual (Exhibit 16), and found to be in compliance with Trust Fund policy on acceptance of employer contributions. RT 48:7–49:9.

17. Northwest did not know that Sacramento was limiting contributions to Elder, Holstrom, Fuller and Hunt during the audit period. RT 51:10–14; 69:14–18.

18. Mr. Winchell acknowledged that Mr. Hunt never really was a foreman. RT 283:11–284:7; 295:3–9.

19. Defendant's proposed Findings of Fact assert that, although Fuller and Holstrom were hired as forklift drivers, by 1986 their job duties had changed to those of working foremen. (Defendant's Findings of Fact, Numbers 17, 20–21, 24–26). Defendant acknowledged at trial that Holstrom and Fuller were identified on seniority lists submitted to Local 150 as forklift drivers. RT 235:11–236:12; 253:5–13; 362:16–20.

20. Mr. Winchell admitted that Hunt and Elder have retired and that he has not replaced them. RT 283:11–284:7; 294:12–295:12.

21. Ms. Van Alst testified that Mr. Tobin, Local 150 business agent at the time of the Hemming Morse audit, told her that the whole affair was "hush, hush" and that all of the listed job classifications were covered under the 1990–1993 and 1993–1996 CBAs. RT 108:14–110:17. At trial, Tobin denied making this statement.

22. Mr. Winchell wrote to Local 150 on March 19, 1996. In his letter he stated that he ran a "two door shop" and that "it was fully known and understood that if Sacramento Stucco was pushed to be an all-union shop, [it] would terminate the agreement." He also admitted that the only reason he renewed the contract was because he had two employees who were about to be vested and collect their full pensions. Exhibit 28.

23. Sacramento Stucco submitted CBAs to Plaintiff in 1990 and in 1993 which on their face committed it to pay contributions on behalf of all employees who performed work in one or more of the job classifications listed in the Wages section. Exhibits 1 and 2.

24. The audit disclosed shortages totaling $218,434 in unpaid employee pension contributions, liquidated damages, costs and attorneys' fees and interest according to proof. Exhibit 8.

25. The Trust Agreement provides for recovery of 20% liquidated damages, interest at the legal rate, costs and attorneys' fees. Exhibit 3, Art. IV, Section 3.

26. Sacramento Stucco has not paid any of the amounts claimed due in Plaintiff's complaint. Exhibit 8.

## ANALYSIS

Defendant relies on the contention that Plaintiff is bound by the intent of Defendant and the Union in drafting the Collective Bargaining Agreements, the E–U's and the Trust Agreement.

It bases this contention on

(1) the ambiguity of the CBA as to which employees were part of the bargaining unit, and therefore covered employees under the Trust Agreement,

(2) the extrinsic evidence of the parties' intent, as evidenced by the testimony of the employer and the Union representative,

(3) the Trust Fund's position, that is, whether it is entitled to no more and no less than either party to the CBAs and the E–U's,

(4) the doctrine of *contra proferentem*, under which the Trust Agreement should

be construed against the Trust Fund, which drafted it,

(5) employees of Western Stucco were not subject to the collective bargaining agreement, since Western was a separate entity from Sacramento Stucco, even after the payrolls were consolidated, and not an alter ego, and

(6) Plaintiff is estopped from collecting from Defendant on the grounds that it continued to accept the proffered contributions.

## AMBIGUITY OF THE CBA's

Defendant contends that the CBAs are ambiguous as a matter of law because they do not define the terms "collective bargaining unit" or "covered employee." *Northwest Administrators, Inc. v. B.V. & B.R., Inc.* 813 F.2d 223 (9th Cir.1987). (Provision in collective bargaining agreement calling for employer to make contributions to pension plan on account of each member of the bargaining unit was ambiguous as to whether parties intended contributions to be made by employer on behalf of seasonal employees, where agreement did not define "bargaining unit" and union recognition clause indicated that union was bargaining agent for all employees covered by jurisdiction awarded union but failed to define scope of jurisdiction.)

Plaintiff contends that the jobs listed in the wage classification section of the CBAs constitute the collective bargaining unit. Defendant rejoins that only one of the nine classifications, the working foremen, constitute the collective bargaining unit. *See Castaneda v. Dura–Vent Corp.*, 648 F.2d 612, 619 (9th Cir.1981) (contract is ambiguous if it is susceptible to more than one interpretation).

The Ninth Circuit in *Pierce County Hotel Employees and Restaurant Employees Health Trust v. Elks Lodge, B.P.O.E. No. 1450*, 827 F.2d 1324 (9th Cir.1987), found that the clause requiring pension contributions for "any person performing work covered by this agreement, whether such employees are members of the union in good standing or not" was not ambiguous.

*Id.* at 1327. For eleven years, the employer had failed to contribute to the trust for non-union temporary employees. *Id.* at 1326. Article I of the collective bargaining agreement recognized the Union as the exclusive bargaining agent of all the employees working in the specified classifications. Employees were defined as all Lodge employees excluding office employees, owner-supervisors and their close relatives. Thus, non-union temporary employees performing work were employees under the agreements. *Id.*

The employer, however, maintained that it was not obligated to contribute on behalf of non-union temporary workers because the clause could be interpreted as requiring contributions either for employees who are union members, "whether or not in good standing" or for all bargaining unit employees "whether or not members of the union." The court rejected this argument, stating that "the Lodge has attempted to create ambiguity where none is present." Since the agreements were unambiguous, the court disregarded extrinsic evidence of the parties' intent. *Id.*

In the case at bar, the collective bargaining agreement between Sacramento Stucco and the union lists nine job classifications, similar to the contract in *Pierce County*. Sacramento Stucco cannot show that the benefit plan administered by Plaintiff was only meant to cover working, union foremen.

 Plaintiff attempted to introduce evidence of practice in the industry (testimony of Wentz) and Defendant testified regarding the history of which employees had been covered by other labor agreements or never covered (laborers and clerks). These proffers are examples of extrinsic evidence, irrelevant to the initial finding whether the CBAs are ambiguous. A CBA which fails to define the "bargaining unit" and where the ambiguity is not resolved by reference to other provisions of the agreement, is ambiguous as to which employees are covered. *Northwest Ad-*

*ministrators v. B.V. & B.R., Inc.* 813 F.2d 223, 225 (9th Cir.1987).

The Court finds that the CBAs do not sufficiently define the terms "collective bargaining unit," "covered work," or "covered employee." Accordingly, this Court finds that the CBAs are ambiguous. The Court will thus consider extrinsic evidence of the intent of the Defendant and the Union, the consequences for the Trust Fund, and whether the agreement between Defendant and the Union is binding on Plaintiff.

## EXTRINSIC EVIDENCE

When the operation of an ordinary contract is not clear from its language, a court generally may consider extrinsic evidence to determine the intent of the parties. *Arizona Laborers, Teamsters and Cement Masons Local 395 Health and Welfare Trust Fund v. Conquer Cartage Co.,* 753 F.2d 1512, 1517 (9th Cir.1985). This principle is applied more liberally in the case of a collective bargaining agreement. *Id.* "Technical rules of contract formation do not confine collective bargaining because the parties are obliged by their relationship to deal exclusively with each other and because policies of the National Labor Relations Act dictate that this process not be encumbered by undue formalities." *Id.* at 1520, *quoting Presto Casting Co. v. NLRB,* 708 F.2d 495, 497–98 (9th Cir.1983), *cert. denied,* 464 U.S. 994, 104 S.Ct. 489, 78 L.Ed.2d 684 (1983). Thus, the district court should not give undue weight to the literal language of the provision regardless of how that provision might be interpreted were this an ordinary contract action. *Id.*

A collective bargaining agreement is not governed by the same common-law concepts which control private contracts, but rather by the provisions of the Labor Management Relations Act ("LMRA"), 29 U.S.C. §§ 141–187, and ERISA. Law other than federal labor law may assist in the interpretation of the collective bargaining agreements only if it "effectuates the policy [that] underlies the

federal labor legislation." *Id., quoting Seymour v. Hull & Moreland Engineering,* 605 F.2d 1105, 1109 (9th Cir.1979).

Section 302(c)(5) of the LMRA requires that payments from an employer to an employee benefit trust fund be made according to a written agreement setting forth the detailed basis on which such payments are to be made. An employer and union, therefore, cannot orally modify the terms of employee benefit provisions of a collective bargaining agreement. *Pierce County Hotel Employees,* 827 F.2d at 1328. Otherwise, "employees, basing their futures on the promise of an old-age pension provided in a union contract, may discover in later years to their surprise that an oral side-agreement had eroded the worth of their pension rights." *Id., quoting Waggoner v. Dallaire,* 649 F.2d 1362, 1366 (9th Cir.1981). Thus, section 302(c)(5) of LMRA precludes a defense of oral modification of a collective bargaining agreement to a multi-employer trust fund's contribution claim under section 502 of ERISA, 29 U.S.C. § 1132. *Pierce County,* 827 F.2d at 1328.

In ascertaining the intent of the parties to a collective bargaining agreement, "the trier of fact may look to the circumstances surrounding the contract's execution, including the preceding negotiations. . . . It may also consider the parties' conduct subsequent to contract formation . . . and such conduct is to be given great weight." *Arizona Laborers,* at 1517–18, *quoting Laborers Health and Welfare Trust Fund v. Kaufman & Broad,* 707 F.2d 412, 418 (9th Cir.1983). *See Also Arizona Laborers* at 1519. A district court should also "consider the scope of other related collective bargaining agreements, as well as the practice, usage and custom pertaining to all such agreements." *Id.* at 1518, *quoting Kemmis v. McGoldrick,* 706 F.2d 993, 996 (9th Cir.1983).

Extrinsic evidence, however, is admissible if and only if the agreement "is fairly susceptible of either one of the two

interpretations contended for." *Markt v. Ro–Mart, Inc.*, 471 F.Supp. 1292, 1297 (N.D.Cal.1979). Thus, if the agreement is not ambiguous by its terms, the parol evidence rule applies, limiting the use of extrinsic evidence. California's Parol Evidence Rule, as amended in 1978 provides in part:

> Terms set forth in writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement.

Cal.Code of Civ.Proc. § 1856(a) (West Supp.1979).

The rule prohibits the consideration of agreements outside the writing itself that would contradict the writing, where it was intended as a final expression of the agreement of the parties. The Ninth Circuit has said, "While evidence of the conduct of the parties during bargaining and contract formation is relevant and should be given great weight," an oral agreement or tacit understanding between [the employer] and the Union that conflicts with or alters the meaning of the agreement should not be considered. *Northwest Administrators v. B.V. & B.R., Inc.*, 813 F.2d 223, 226–227 (9th Cir.1987). A contrary rule would create "collusion and controversy to the detriment of the employee beneficiaries." *Id.*

Defendant offers evidence of an understanding between the employer and the Union as evidence of the reasonable interpretation of the CBAs, and in this case, in accordance therewith, Defendant's obligation to make contributions on behalf of its employees to the Trust Fund. The Trust Fund views this testimony as evidence instead of an impermissible side agreement between Defendant and the Union, which is not binding on the Trust Fund.

In a nutshell, if the Court concludes, based on the evidence at trial, that it is unreasonable to interpret the contract terms "collective bargaining unit," "covered employee," and "covered work," to mean only working, union foremen, then any parol evidence to the contrary would not change the meaning of the contract.

Mr. Winchell, the owner of Sacramento Stucco, testified that the 1983–1986 CBA defined the collective bargaining unit to include employees who worked in the job classifications listed in the wages section. RT 275:18–276:13. The 1983–1986 CBA is identical in all relevant aspects to the CBAs at issue herein. In fact, Mr. Winchell testified that it was only "logical" that employees who worked in three of the job classifications listed in the wages section of the earlier contracts were covered. RT 277:25–278:3.

Accordingly, since the 1983–1986 CBA is identical to the CBAs at bar and there was no evidence that Mr. Winchell or Mr. Elder ever actually discussed with any business representative limiting the later contracts to working foremen only, the reasonable inference to be drawn is that the bargaining parties knew that the CBAs covered all of the job classifications listed in the wages section. This interpretation is more reasonable than that the bargaining unit only included one of the job classifications listed in the wages section, the working foremen, especially since there were employees working for Defendant in the other classifications.

Defendant's past practice of only paying contributions on behalf of employees Hunt, Elder, Fuller and Holstrom shows an intent to cover four individuals as opposed to groups of employees. Ms. Van Alst testified that Mr. Rozewski stated to her during their first exit interview that he believed the contracts covered individuals and not job classifications. RT 105:15–106:8. However, this evidence is incompatible with Mr. Winchell's testimony that he intended to cover union "working foremen" only.

The seniority list completed by Defendant consisted of one foreman and two forklift drivers. See Exhibit 26. Mr. Winchell testified that he considered employ-

ees Fuller and Holstrom as forklift drivers, at least at the time they were hired. RT 331:23–332:1. He further testified that Mr. Hunt wasn't much of a supervisor, if at all, and was not replaced after retiring in 1988 because his departure left "no void." RT 283:11–284:7; 295:3–9. Moreover, employee Elder (the man who ran the whole operation for both companies) retired, yet he too has not been replaced. RT 294:12–295:12. The only reasonable inference to draw from this evidence is that Defendant never intended to cover all employees in the working foremen classification, but instead these four individuals who coincidentally were long-service employees.

Defendant also disputes that the working foremen "were all long-term employees", or "soon to retire." However, there is no question that they were the most senior employees of Defendant and would be the first to retire. It is also reasonable to infer from Mr. Winchell's testimony that he never intended to replace the working foremen who retired with new union men, but instead would simply let the contracts expire once employees Holstrom and Fuller retired or quit. This is exactly what happened after the last Laborer union employee left in late 1983. RT 315:5–8.

Plaintiff's management and contract review personnel testified that nothing alerted them in any way that covered employees under the CBAs were limited to working foremen. Plaintiff's employees routinely followed the New Accounts Procedure Manual (Exhibit 16) to determine whether every CBA submitted to Northwest complied with Trust Fund policy regarding acceptance of employer contributions. Contract review personnel are trained and understand how the manual (specifically, pages 1–3) is to be used. RT 48:7–16. Mr. Pentz, Ms Turner, Ms. Van Alst and Mr. Schmid—four witnesses all testified that in their experience the wages section identifies which employees are covered by the collective bargaining agreement. RT 47:22–49:5; 69:14–18; 92:4–94:5; 125:3–19; 144:7–145:19.

Defendant attempts to discount the experience of these witnesses with evidence of "common usage in the industry" in interpreting the CBAs. However, this Court finds Plaintiff's evidence to be persuasive, given its experience in this area. The testimony also tends to show that Plaintiff had no notice of Defendant's special interpretation of the CBAs, since it was unique to this employer.

In its opening statement Plaintiff predicted that it would show that "something happened" in the mid 1980's; either an oral side agreement with Local 150 or at least an undisclosed intention of Sacramento Stucco to limit the financial impact of the Local 150 contracts while at the same time preserving the pensions of existing member-employees, all to the detriment of the Trust Fund and other covered employees.

Proof that "something happened" can be found in Ms. Van Alst's testimony. She related a telephone conversation which she had initiated with Teamster representative Mike Tobin about his understanding of who was covered under the CBAs. He stated that the whole affair was "hush, hush." She also wrote in her telephone notes that Mr. Tobin believed the contracts covered all positions listed in the wages section. RT 108:14–110:17 and see also Exhibit 23. On the stand, Mr. Tobin denied making these admissions. However, this does not jibe with the testimony of Mr. Winchell, Defendant's owner, who testified that he believed the jobs listed in the wage classifications for which he had people working constituted the collective bargaining unit. RT 277:25–278:3.

In light of this evidence, the arrangement appeared to be identical to the facts in *Teamster's Local 348 Health & Welfare Fund v. Kohn Beverage Co.*, 749 F.2d 315 (6th Cir.1984) (Collective bargaining agreement required employer to contribute to the Health and Welfare Fund) "for each employee covered by this Agreement," Article XIV, and to the Pension Fund "for each regular employee covered

by this Agreement," Article XVII. Article II of the agreement provided that "[t]he term 'Employees', as used in this Agreement shall include Driver–Salesmen, Special Drivers, Swing Drivers, Over–the–Road Drivers, Helpers and Warehousemen, Garage Mechanics and Garage Maintenance employees." The agreement included a recognition clause and a union shop clause. The court construed a definition of employees by job classification to require coverage by the collective bargaining agreement of all employees within those classifications, regardless of union membership. *Id.* at 318.

Ms. Van Alst had every incentive to be truthful at trial. She is the Litigation Supervisor at Hemming Morse—a position that demands impeccable credibility and an unassailable reputation for telling the truth. RT 98:15–20. Mr. Tobin, on the other hand, did have reason to conceal his participation in protecting the employer's two-door shop in an effort to maintain a flow of pension contributions to his remaining members' retirement accounts. Exhibit 28, Mr. Winchell's March 19, 1996 letter to Local 150, confirms this conclusion.

Mr. Tobin also testified that Local 150 historically deferred to the Laborers union and did not seek to enforce the CBAs as to anyone other than employees Elder, Hunt, Fuller and Holstrom to avoid a union jurisdictional dispute. RT 164:1–166:8; 196:3–197:1. Evidence at trial established that the last member of the Laborers Union left Sacramento Stucco in late 1983. RT 291:15–21. Local 150 has had three business representatives on the Sacramento Stucco account since the early 1980s. After the Laborers union no longer had any presence at Sacramento Stucco, the business agents may have failed to enforce the Teamsters' collective agreement as to any subsequent new hires, or the business representatives may simply have reconciled themselves to protecting what they could get—pensions for four long-service employees.

Union business agent Cliff Webb testified that his intention was to cover "lead persons" as opposed to "working foremen." RT 204:7–205:1; 211:13–24; 215:15–216:9. Mr. Webb also testified that the collective bargaining agreements also covered employees in the forklift drivers classification. RT 209:4–212:23. He also testified that he believed that the Laborers union covered some of the job categories listed in the wages section. RT 206:7–20; 212:5–23. But, like Mr. Tobin, he felt "very fortunate" that Defendant allowed Local 150 at least to represent the lead people. RT 214:18–215:1.

Defendant offers an alternative explanation, that the Union representatives were grateful because "normally . . . companies take the position that once you're a working foreman, you're out of the bargaining unit." R.T. 214:22–25; 215:1. The reasonable inference from Mr. Webb's testimony is that he deferred to the jurisdiction of the Laborers union to protect his soon-to-retire members, and that he was grateful to have any members at all in the bargaining unit, if only the working foremen, so he did not push to include employees in the other wage classifications.

Any such jurisdictional preclusion of coverage under the Teamster contract is prohibited by the case law. *Maxwell v. Lucky Const. Co. Inc.*, 710 F.2d 1395 (9th Cir.1983) and *Operating Engineers Pension Trust v. Giorgi*, 788 F.2d 620 (9th Cir.1986) stand for the proposition that fringe benefit contributions are due on all hours worked by employees covered in a contract, regardless of what other contractual or oral agreements an employer might have with a union.

■ When a union and employer attempt to refer to undisclosed oral agreements or side agreements to "interpret" the contract in a favorable way, ERISA requires that the Trust Fund's interpretation of the written agreement be controlling. *Central States, Southeast and Southwest Areas Pension Fund v. Gerber*

*Truck Service, Inc.*, 870 F.2d 1148 (7th Cir.1989).

The extrinsic evidence offered at trial in this matter indicates that the parties intended that at least some of the job classifications listed in the wages section of the CBAs constituted the collective bargaining unit. Their understanding was shaped, however, by which individuals were working in those classifications. When Fuller and Holstrom were working as forklift drivers, then forklift drivers were part of the collective bargaining unit. After they were promoted to working foremen, then only working foremen were considered to be in the collective bargaining unit. The problem is that Plaintiff had no notice of this shifting understanding between Defendant and the Union.

The extrinsic evidence shows that the intent of Defendant and the Union was to provide benefits for certain individuals, and to interpret the collective bargaining unit to include only those individuals.

## POSITION OF THE TRUST FUND

Pension plan administrators are not parties to participation agreements. *Gerber Truck*, 870 F.2d at 1151. They are also not third-party beneficiaries. Third-party beneficiaries usually take contracts as they find them. *Id.* In fact, the Trust Fund in the case at bar, under section 515 of ERISA,[3] stands in a better position than a third-party beneficiary, more like a holder in due course, since its rights are independent of the agreement between the parties to the CBA. *Central States, Southeast and Southwest Areas Pension Fund v. Independent Fruit and Produce Co.*, 919 F.2d 1343, 1348 (8th Cir. 1990). For instance, a trust fund may defeat a contract defense which would have been binding on the parties. *Southwest Administrators, Inc. v. Rozay's Transfer*, 791 F.2d 769, 775 (9th Cir.1986), cert. denied, 479 U.S. 1065, 107 S.Ct. 951, 93 L.Ed.2d 999 (1987) (rejecting employ-

er's defense that promise to make contributions was fraudulently induced.)

In fact, at least one court has surveyed the case law and concluded that "the courts recognize only two defenses to a collection action: that the pension contributions are themselves illegal or that the collective bargaining agreement is void." *Central States v. Independent Fruit and Produce Co.*, 919 F.2d at 1348. (Citations omitted.)

In response to problems experienced by pension plans in securing payment of contributions, Congress added § 515 to ERISA in 1980. *Gerber Truck*, 870 F.2d. at 1152. Section 515 allows the plan to bring suit against a delinquent employer and prevents a court from giving force to oral understandings between unions and employers that contradict the writings. *Id.* at 1154.

The reason for this special consideration accorded pension plans is the recognition that multi-employer plans would be in a difficult position to collect delinquent contributions, avoid costly litigation, and enhance actuarial planning if ordinary third-party beneficiary rules of contract interpretation applied. Any flaws found in the formation of a contract between the union and the employer could defeat the plan's right to collect contributions. *Central States v. Independent Fruit and Produce Co., supra,* at 1348. (By enacting section 515, Congress acknowledged that plans must be able to rely on accurate actuarial computations to make decisions about which claims to pay). Plans rely on collective bargaining agreements to calculate the income they can expect to receive, which governs their adjustments of benefits. *Id.* Multi-employer plans are defined-contribution in, defined-benefit out. *Central States*, 870 F.2d at 1151. Once a fund commits to provide benefits to covered employees, it must keep its commitment to pay out benefits, even if the income from

---

3. Section 515 of the Employee Retirement Income Security Act (ERISA) obligates an employer to pay to a multi employer plan contributions that are required "under the terms of the plan or under the terms of a collectively bargained agreement."

contributions is less than predicted, whether the cause is employer bankruptcy or other failure to make the required contributions. *Id.*

Plaintiff's expert, Mr. Pentz, testified about maintaining the "actuarial soundness" of the Trust Fund. He stated that he had over 29 years' experience with Plaintiff's administration of the trust contributions and had discussions with Trust Fund actuaries about contract provisions that would be deemed "detrimental to the plan." RT 89:16–90:10. Specifically, he learned from Plaintiff's actuaries that employers' attempts to limit coverage to long-service employees would harm the Trust Fund by creating a closed group of participants.

All employers and union representatives are on notice that the Trust Fund will not accept a contract which contains provisions "detrimental to the Plan"—a determination which is made by the Trustees in their "sole discretion." Exhibits 4 and 5 (the E–U's). On page 2 of both exhibits is a list of examples of provisions which could result in a determination that a Pension Agreement is detrimental to the plan. Included are the following:

1. Provisions which limit the employees on whose account contributions are to be made to those above a specified age.
2. Provisions which limit the employees on whose account contributions are to be made to those who will be eligible for retirement within a specified period.

Even if the CBAs in this case are ambiguous and must be interpreted as suggested by Defendant, there is a direct conflict with the above policies since Sacramento Stucco clearly intended to limit contributions to certain older, long-term, soon-to-retire employees.

Again, *Central States Pension Fund v. Independent Fruit and Produce Co., supra,* is helpful. In that case the Fund presented testimony that it would not have accepted the CBA's had it known or had reason to know that the bargaining parties attributed a meaning to the term "casual employees" outside the normally accepted definition. In the case at bar Mr. Pentz testified that, based on his experience and information that he had obtained from the Trust Fund actuary, he rejected the 1996 letter agreement to retroactively reform the CBA (Exhibits B and C), because he knew by the time they were presented to him that the parties were attempting to limit contributions to certain long-service employees. RT 89:2–91–2. "Because of the actuarial detriment inherent in arrangements that limit contributions to only those employees that are likely to receive benefits, the Pension Fund prohibits the participation of employers who split the bargaining unit for the purpose of pension coverage." *Central States v. Independent Fruit and Produce Co.,* 919 F.2d at 1348.

 Thus, the Court concludes in the case at bar, that Defendant and the Union reached an agreement, without the knowledge or consent of the Trust Fund, which would necessarily undermine the actuarial soundness of the trust, by providing benefits and requiring contributions for long-term employees only, who would soon begin receiving benefits. Such an agreement is unenforceable.

### CONTRA PROFERENTEM

Special rules of contractual interpretation apply in cases involving the administration of an employee benefit trust agreement. *Board of Trustees of the Watsonville Frozen Food Welfare Trust Fund v. Cal. Cooperative Creamery,* 877 F.2d 1415, 1420 (9th Cir.1989). Some courts have applied the doctrine of *"contra proferentem,"* which construes ambiguous language against the profferer. *Northwest Administrators, Inc. v. B.V. & B.R., Inc.* 813 F.2d at 226. However, the Ninth Circuit has expressed doubt that the "doctrine is of much direct assistance in determining the issue of intent." *Id.* The court recognized that this doctrine is not an unusual tool in common law contract interpretation, but it cautioned against its application to a labor contract. *Id.*

Nevertheless, the court did not entirely rule out use of the doctrine in an ERISA case, "... if the [district court] finds that [the fund] was directly or indirectly responsible for the disputed language, that application of the doctrine will assist in determining the parties' intent, and that application of the doctrine would effectuate the policy underlying ERISA in the particular circumstances before the court." *Northwest*, at 226. Ultimately, the court in that case found that the district court's reliance on the doctrine of *contra proferentem* was erroneous because the district court made no findings as to whether the fund was directly or indirectly responsible for the language that caused the ambiguity.

This Court finds in the case at bar that the Trust Fund played no role in drafting the CBAs, where Defendant contends the ambiguity lies. Although Defendant denies that it attempts to enforce the doctrine of *contra proferentem*, it seeks to hold Plaintiff responsible for permitting the ambiguous language to remain in the case and not compelling the Union to clarify it. On the other hand, Defendant and the Union were both on notice that certain types of pension plan limitations would be unacceptable to the Plaintiff and could result in the agreement being rejected as detrimental to the plan.

There is an overriding federal policy in favor of uniform interpretation and enforcement of labor contracts containing similar provisions. *Kemmis v. McGoldrick*, 706 F.2d 993 (9th Cir.1983). Northwest made every reasonable effort to enforce this policy in reviewing contracts of this type. Since Northwest was neither directly nor indirectly responsible for the ambiguous contract language, the *contra proferentem* doctrine discussed in *Northwest Administrators, Inc. v. B.V. & B.R., Inc.*, *supra*, has no application.

"In cases involving a trust agreement [c]ourts must defer to the trustees' interpretation of a trust agreement unless the interpretation is arbitrary, capricious, or contrary to law." *See Board of Trust-*ees of the Watsonville Frozen Food Welfare Trust Fund v. Cal. Cooperative Creamery*, 877 F.2d 1415, 1420 (9th Cir. 1989). This Court finds it is not arbitrary or capricious to interpret the Trust Agreement to require contributions for all employees in the job classifications listed in the CBA's.

## WESTERN STUCCO—ALTER EGO?

Plaintiff argues that Sacramento Stucco created a sham corporation, Western Stucco, to avoid making pension contributions on behalf of employees other than the working foremen. Sacramento Stucco contends that Western Stucco was set up for tax savings purposes. However, it admitted that no tax savings were ever realized. Furthermore, the company kept two separate payrolls, one for the union foremen and one for non-union foremen. If Sacramento Stucco actually believed that the CBA limited pension contributions to working, union foremen only, then why keep two payrolls, given that the employees of the two entities worked side by side at the same location?

The Ninth Circuit in *UA Local 343 v. Nor–Cal Plumbing, Inc.*, 48 F.3d 1465 (9th Cir.1994), listed the criteria for determining whether an alter ego situation is present, where two entities constitute a single employer. The Court must analyze the degree of (1) common ownership, (2) common management, (3) interrelation of operations, and (4) centralized control of labor relations. At pp. 1470 & 1471. No single factor is controlling, nor need all criteria be present. *Id.*

Once the threshold criteria are met, the critical inquiry is whether an employee is using a non-union company in a sham effort to avoid the obligations of a CBA. *See also, Brick Masons Pension Trust v. Industrial Fence & Supply, Inc.*, 839 F.2d 1333 (9th Cir.1988) in which the district court did not find an alter ego situation, in part because the non-union company was not created for purposes of shifting a portion of work from the union company to

the non-union company and both companies targeted different markets.

■ In the instant case, Ms. Van Alst, a Trust Fund auditor, testified that she conducted a search of public records and found that Mr. Winchell owned both companies and that both companies shared the same officers, operated out of the same location, and had the same mailing address. RT 111:15–112:1 and see also Exhibit 8, pages 3 and 4. None of these facts are denied by Defendant. Mr. Rozewski characterized Western Stucco as merely a payroll company and that the payroll was "merged" into Sacramento Stucco at the end of the third quarter in 1992. RT 234:18–235:10.

Mr. Winchell confirmed in his testimony that he purchased and owned Western Stucco at about the time business increased, in order to realize a tax benefit for Sacramento Stucco. He also testified that he learned soon after[4] purchasing Western Stucco that the tax benefit would not be available due to changes in the tax laws, yet he chose to continue to bear the cost and expense of running two payrolls and two corporations for *six* years simply because he "didn't feel like changing at the time." RT 278:4–280:24. Mr. Winchell further testified that during this time, he "grand-fathered" employees Elder, Hunt, Fuller and Holstrom into the Sacramento Stucco payroll and put all of his newly hired employees—including material handlers, warehousemen, forklift and truck drivers—onto Western Stucco's payroll even after knowing there was no tax advantage from maintaining a second company. RT 321:7–327:19. Finally, Mr. Winchell testified that employees Elder, Hunt, Fuller and Holstrom supervised all of the Western Stucco payroll employees. RT 283:11–287:23.

This testimony satisfies all of the threshold criteria for a finding of alter ego. Exhibit 28, Mr. Winchell's March 19, 1996 letter to Local 150, is irrefutable proof that Western Stucco was utilized to avoid paying pension contributions for other employees. In that letter to the union, written after he received notice of the results of the audit, Mr. Winchell admitted he ran a "two door shop" and that "it was fully known and understood that if Sacramento Stucco was pushed to be an all-union shop, [it] would terminate the agreement." He also admitted that the only reason he renewed the contract seven years before was because he had two employees who were about to become vested and collect their full pensions.

Mr. Winchell's attempt at trial to characterize his own letter as "inaccurate" and written "out of anger" was undermined by the union business representatives' consistent testimony that they felt lucky to have any union presence at Sacramento Stucco and were trying to protect the pensions of its members employed by the company. RT 110:1–6; 217:21–218:4; 214:18–215:1. This testimony viewed together with Exhibit 28 supports a reasonable inference that the bargaining parties had some unwritten side agreement to allow the employer to limit its pension contributions to the foremen at the expense of non-union employees in the remaining job classifications.

This conclusion is also supported by Exhibit 4, Mr. Winchell's handwritten statement above his signature line on the 1990–1993 Employer–Union Pension Certificates whereby he sought to limit the certification documents to Sacramento Stucco only and Exhibit 26, the Seniority List submitted by Defendant to Local 150 identifying one foreman only and two forklift drivers, as covered employees. These exhibits along with Winchell's testimony support the legal conclusion that Western Stucco was intended to be used as an alter ego of Sacramento Stucco to circumvent the otherwise clear provisions for pension contributions set forth in the contract.

The merger of the Western Stucco and Sacramento Stucco payrolls was not a "triggering event" for purposes of cutting

---

4. Defendant says two years after.

off its obligation to make contributions. Because the alter ego elements found in *UA Local 343 v. Nor–Cal Plumbing, Inc., supra,* and *Brick Masons Pension Trust v. Industrial Fence & Supply, supra,* are so clearly in evidence here, Plaintiff has established a continuing, uninterrupted legal responsibility on the part of Sacramento Stucco to pay pension contributions on behalf of covered employees. The return of these employees to the Sacramento Stucco payroll in 1992 made the alter ego relationship between Sacramento Stucco and Western Stucco obvious to the auditor.

During the period of the pension trust audit in question here, 1992 to 1995, unreported employees formerly on the Western Stucco payroll were doing covered work and were on the Sacramento Stucco payroll. RT 104:9–110:17. Consequently, those employees were covered by the Trust Agreement and contributions were due on their behalf.

### ESTOPPEL

Sacramento Stucco asserts that the Trust Fund is estopped from bringing this claim because it has been accepting the monthly contributions from Sacramento Stucco on behalf of the working foremen only.

The elements of an estoppel defense are:

(1) the party being estopped [the Plaintiff] must know the facts; (2) [the Plaintiff] must intend that his conduct shall be acted on or must act so that the party asserting the estoppel has a right to believe it is so intended; (3) the latter [the Defendant] must be ignorant of the true facts; and (4) he [the Defendant] must rely on the former's conduct to his injury. *Bob's Big Boy Family Restaurants v. N.L.R.B.,* 625 F.2d 850, 854 (9th Cir.1980). The specific elements of estoppel are questions of fact. *Shamrock Development Co. v. City of Concord,* 656 F.2d 1380, 1386 (9th Cir.1981).

The facts of this case are very similar to the facts in *Markt v. Ro–Mart, Inc.,* 471 F.Supp. 1292 (N.D.Cal.1979), in which Judge Zirpoli of this District found that there was no detrimental reliance by the defendant. In that case defendant employer asserted estoppel in defense of its failure to pay contributions on behalf of employees who were not members of the Union from the time it had entered into the agreement four years earlier. For three years the trust fund failed to protest that contributions were payable on behalf of non-member employees as well as on behalf of Union members. *Id.* 1297.

The court in *Markt* did not address the first three elements of the test because it found that the fourth element was lacking. *Id.* at 1298. The court reasoned that if the trust had caught the deficiency from the start, the defendant would have had to make contributions on behalf of non-union employees. *Id.* at 1298. Thus, he was not injured. Plaintiff in the case at bar offers the same reasoning.[5]

There is no significant difference between *Markt* and the case at bar. The trust fund did not know of the deficiency earlier. Hence the first element is not present. And if the fund had known of the deficiency earlier, it would have sought to compel Sacramento Stucco to pay the deficiency which had accumulated since 1987, when the non-union employees were hired by Western Stucco. Contrary to its stated position, rather than detrimentally relying on the Trust Fund's action, Sacramento Stucco actually benefitted from it, because now it is only required to pay for delinquent contributions from September, 1992 through June, 1995, subject to the statute of limitations.

Regarding the third element of the test, Plaintiff in this case has established Sacramento Stucco's undisclosed intention to avoid its obligation. Thus, it can hardly claim ignorance of the "true facts". Fur-

---

5. Had defendant paid the deficiency without having to resort to the court, it would not have incurred the other costs such as interest, attorney's fees, etc.

ther, the contract documents in no way could have alerted Plaintiff to the assumption made by Mr. Winchell that the contracts only applied to foremen. Rt 347–48. In his attempt to show that he "disclosed" his intention to the Trust Fund, Mr. Winchell testified that he wrote "verbiage" on the 1990–1993 E–U limiting the contract documents to Sacramento Stucco so that the Teamsters could not claim jurisdiction over Western Stucco employees. RT 306:24–307:10. Ms. Turner testified that the inserted language had no effect on Northwest's acceptance of the 1990–1993 CBA, because the qualifier was not detrimental to the Trust Fund. RT 52:11–53:11. But, Plaintiff had no knowledge of the existence of Western Stucco or that it had employees who performed work within one or more of the listed job classifications. If it had, the contracts would have been rejected. RT 48:19–24.

Mr. Winchell also attempted to bolster his claim that he disclosed his intentions because he wrote the number "3" in the space following the pre-printed words "APPROXIMATE NUMBER OF COVERED EMPLOYEES _____" on the 1990–1993 and 1993–1996 E–U's. RT 306:7–20. Ms. Turner testified that the inserted number had no significance as far as determining a floor or ceiling in limiting the pension contributions. Rather, the number is used to determine how many employee beneficiary cards to send out to the employer to obtain information on covered employees. RT 51:21–52:10.

Most importantly, nowhere is the word "foremen" written on the E–U's. Northwest employees would have to be mind readers to even remotely suspect that the bargaining parties intended to limit the CBAs.

Accordingly, Defendant has failed to establish the requisite knowledge by Plaintiff to support an estoppel defense and injury to itself.

## WEIGHING THE EVIDENCE

In opening statement Defendant's counsel asserted that an adverse ruling would be financially devastating to Sacramento Stucco. If true, this would mean that Mr. Winchell and Mr. Rozewski (Defendant's office manager) had a compelling reason to shape their testimony to fit proffered legal defenses, such as contract ambiguity.

The union officials admitted to a strong desire to protect Local 150's diminishing membership at Sacramento Stucco and particularly the retirement benefit expectations of employees Elder, Hunt, Fuller and Holstrom. Having accepted Sacramento Stucco's "two door" arrangement, either overtly or by acquiescence, they also had motives which colored their testimony regarding contract construction and application.

None of Plaintiff's witnesses can be shown to have any such motive to distort the facts. And the documents speak for themselves.

## CONCLUSION

Plaintiff has met its burden of proof that contributions are due and owing for covered employees of Defendant for whom pension fund contributions were not made, at both Sacramento Stucco and Western Stucco.

Although the CBAs are somewhat ambiguous on their face, by not precisely defining terms such as "collective bargaining unit", "covered employee" and "covered work", Defendant's effort to present evidence that the parties intended to cover groups of workers rather than the four individuals whom Defendant called "working foremen" is contrary to established authority and not binding on Plaintiff. Plaintiff was not responsible for creating any ambiguity or misunderstanding regarding Defendant's obligations under the labor contract. Even if the parties had demonstrated a clear intent to limit contributions, Plaintiff would not be bound, if the result would be detrimental to the Trust.

Plaintiff has demonstrated that Defendant was attempting to violate public policy and engage in a practice detrimental to the Trust by making benefit contributions

**990**

only for long-term employees who were closer to retirement than other employees, for whom contributions were not provided. Such a practice undermines Plaintiff's actuarial calculations and ultimately its ability to administer benefits for the workers who depend on it.

As a matter of law, the doctrine of *contra proferentem* is not applicable to a labor contract under ERISA where the Trust Fund was not responsible for the alleged ambiguity; and, therefore, it may not be invoked against Plaintiff in the case at bar.

Defendant has not established it qualifies to invoke an estoppel defense against Plaintiff, since Plaintiff had no knowledge of Defendant's side agreement with the Union.

Plaintiff has proven that Western Stucco was an alter ego of Sacramento Stucco, and consequently its employees were covered by the Trust Agreement.

For all the above reasons, judgment shall be entered for Plaintiff. This Court will schedule a hearing, to determine the exact amount of damages and attorney fees.

Counsel shall appear on **March 15, 2000 at 10:30 a.m.** for a further case management conference, to schedule such a hearing.